Jose V. Ferrer, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 6019–65. Filed April 30, 1968.

*Samuel L. Siegel,* for the petitioner.
*Paul H. Frankel* and *Agatha L. Vorsanger,* for the respondent.

Fay, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the calendar year 1962 in the amount of $122,840.18. The issues presented for determination are: (1) Whether $205,840.03 of the salaries received by the petitioner during 1962 is exempt from taxation under section 911(a)(1) of the Internal Revenue Code of 1954; and (2) if such income is not exempt, whether petitioner's unreimbursed business expenses applicable to this income entitle petitioner to a deduction in excess of the amount allowed by the respondent.

178

Some of the facts have been stipulated, and the stipulation of facts together with the exhibit attached thereto is incorporated herein by this reference.

Jose V. Ferrer (hereinafter referred to as the petitioner) is an actor, director, and producer. He is, and was prior to and during the year 1962, a citizen of the United States. For the calendar year 1962 he filed his Federal income tax return, on the cash basis, with the district director of internal revenue, New York, N.Y. He is the sole owner of a home located in Ossining, N.Y., and was a resident thereof at the time the petition herein was filed.

During the latter part of 1961 the petitioner was experiencing marital difficulties. In September 1961 his wife, Rosemary Clooney Ferrer, commenced an action for divorce in the Superior Court of the State of California, County of Los Angeles. On October 26, 1961, the court ordered that custody of the children and the occupancy of the family residence in Beverly Hills, Calif., be awarded to petitioner's wife.

Also during this period petitioner was experiencing occupational difficulties. Sometime prior to November 28, 1961, petitioner's agent, General Artists Corp. (hereinafter referred to as GAC), negotiated a contract whereby petitioner would render his services as an actor in a photoplay entitled "Nine Hours to Rama" for Twentieth Century-Fox Film Corp. The photoplay was to be filmed both in India and in London, England. The record does not reveal the time during which these negotiations took place. On November 16, 1961, the petitioner secured a visa from the Consulate of India in San Francisco, Calif., which stated that the permissible stay of petitioner was for a period of 3 months.

On or about November 24, 1961, petitioner left the United States to go to New Delhi, India, for the purpose of appearing in "Nine Hours to Rama." He arrived in New Delhi on or about November 29, 1961. Petitioner remained there until January 17, 1962. While in India, petitioner resided in a rented apartment. Twentieth Century-Fox Film Corp. paid the petitioner $100 per day for his living expenses while in India. On January 17, 1962, petitioner left for London, England, and from that date, except for a 1-week return to the United States to visit his children and to clear up certain personal matters, until March 9, 1962, petitioner was in London. During this entire period, he was in the employ of Twentieth Century-Fox Film Corp. appearing in the photoplay "Nine Hours to Rama." While there petitioner lived in a leased furnished apartment. Again he received the $100 per day living expense allowance.

On January 25, 1962, petitioner entered into an agreement with Columbia Pictures and Transocean Pictures to appear in the motion

picture "Lawrence of Arabia," which was, insofar as petitioner was concerned, to be shot on location in Spain.

Sometime during his stay in London, petitioner inquired into the possibility of reducing his potential United Kingdom income tax liability. He was informed that he would become liable for United Kingdom taxes on income earned there if he remained in England for a period of 183 days in any 1 fiscal year commencing April 5 or he habitually made visits to England. This, he was informed, meant visits amounting to 3 months in the fiscal year. Pursuant to the advice received, petitioner did not wish to stay in England for a period extending beyond 6 months and decided to so conform his plans.

In connection with the filming of "Lawrence of Arabia," petitioner was on location in Spain from about March 12, 1962,[1] until about March 27, 1962. While in Spain he had hotel accommodations which along with his meals were furnished by Transocean Pictures.

On or about March 9, 1962, petitioner entered into an agreement with Warwick Productions to direct the motion picture "The Long Ships." From March 27, 1962, until the latter part of April 1962, petitioner was, in the performance of this contract, in Yugoslavia.

On or about April 26, 1962, petitioner returned to the United States and appeared in the divorce action which had been instituted in California by his wife. He remained in the United States until May 11, 1962. On May 11, 1962, he returned to Yugoslavia to continue work on "The Long Ships." He continued this employment until about May 25, 1962, and it appears remained in Yugoslavia until May 30, 1962. While there petitioner had hotel accommodations which were furnished along with meals and the use of a car and chauffeur by Warwick Productions. The film company also had agreed to provide to petitioner, on completion of his agreed services, airline transportation to California or any other place to which petitioner may have decided to go.

During the period May 30, 1962, until October 3, 1962, petitioner was present in many different locations throughout England, Spain, Italy, Switzerland, Monaco, France, Ireland, and Austria living either in apartments or hotels. During this period generally petitioner worked on two screen plays, "Death in Venice" and "O'Hoolihan's Jest." Specifically during this period petitioner was present in Madrid and Almeria, Spain, from June 19 until June 22, 1962; in Dublin, Ireland, from July 31 until August 1, 1962; and in Deauville, France, from August 4 until August 5, 1962, working in reference to the screen play "O'Hoolihan's Jest." He was also in La Spezia, Itay, working on this screen play and on "Death in Venice" from August 21 until August 27, 1962. Also, for at least part of this general period, petitioner was on vacation.

---

[1] The record is not clear as to petitioner's whereabouts from Mar. 9, 1962, until Mar. 12, 1962.

On September 14, 1962, petitioner agreed with Campagnia Cinematarfia to appear as an actor in the motion picture "Cyrano & D'Artagnan" and from October 3, 1962, to the latter part of December 1962 he was in Italy at work on this film. While there, petitioner had hotel accommodations and in addition received a $500 per week living allowance from Campagnia Cinematarfia. Also in December petitioner went to London to attend the premiere of the film "Lawrence of Arabia."

On or about January 3, 1963, petitioner returned to the United States and on January 21, 1963, he entered into an agreement with George Stevens Productions, Inc., for his appearance in the motion picture "The Greatest Story Ever Told."

During the entire year 1962 it does not appear that petitioner ever owned a home, voted, or in any particular way entered into the community life of the countries in which he was living. While abroad he maintained bank accounts in England and Italy and charge accounts at some London shops. For the most part, petitioner was engaged in his trade or business as an actor, director, and producer. In addition to being engaged in the production of various films, he was also engaged in the development of two screen plays which he intended to produce on his own behalf.

During the major portion of the taxable year petitioner employed a personal secretary, one Stella Magee, who worked for petitioner in London and Rome. The various personal living accommodations used by petitioner throughout the year were also utilized for business purposes.

For this entire period, petitioner's agent GAC made substantial efforts to secure employment for him both in Europe and in the United States. The efforts in the United States consisted both of submitting petitioner for acting roles in various films and attempts to secure directing assignments.

During his absence in 1962, petitioner had a caretaker for his home in Ossining, N.Y. He also maintained bank accounts in both California and New York and various charge accounts in New York during the year.

On September 3, 1963, petitioner registered to vote in New York State. In response to an inquiry on the registration form as to the length of his "continuous residence" at the time of the next election (i.e., November 1963), petitioner stated that he considered himself to have been in "continuous residence" in New York, in Westchester County, and in his election district during the past 23 years.

Petitioner did not file income tax returns for 1962 in any country other than the United States and he did not apply for citizenship

in any foreign country during that year. Petitioner did not pay any income taxes to any country other than the United States for 1962. He did file a New York State income tax return for 1962.

During 1962 petitioner received the following salaries for his artistic services:

| Payor | Amount |
|---|---|
| Twentieth Century-Fox | $108,333.33 |
| Columbia Pictures | 15,000.00 |
| Transocean Pictures | 10,000.00 |
| Warwick Productions | 19,736,70 |
| U.S.I.A. | 300.00 |
| Campagnia Cinematarfia | 52,770.00 |
| Hoche Productions | 22,500.00 |
| Total | 228,640.03 |

On his 1962 income tax return, petitioner claimed that the amounts received from Twentieth Century-Fox, Columbia Pictures, Transocean Pictures, Warwick Productions, and Campagnia Cinematarfia, aggregating $205,840.03, were exempt from taxation under section 911(a)(1), allegedly being income received while a "Bona Fide Resident of Foreign Country." On a schedule attached to his 1962 return, petitioner stated that his business expenses "Applicable to Foreign Income" aggregated $86,389.34; that of said amount he was reimbursed, by the several motion-picture studios for whom he was appearing during said period, $17,306.99; that his "Net Business Expenses" for the calendar year 1962, "Applicable to Foreign Income" was $69,082.35; that included in said $69,082.35 was $30,379.03 expended for "Europe Expenses relating to taxpayer's work as an actor and/or director"; and that the balance of said $69,082.35 (i.e., $38,-703.32) was for various "Business Expenses." Consonant with his contention that the aforementioned $205,840.03 is exempt from taxation, petitioner did not claim a deduction for the aforementioned expenses of $69,082.35 on his 1962 return.

In his statutory notice of deficiency, respondent determined that the $205,840.03 is not exempt from taxation. In said notice, respondent allowed a deduction for the $38,703.32 of various "Business Expenses" which were applicable to petitioner's foreign income.

### OPINION

The first issue for determination is whether petitioner was a bona fide resident of a foreign country or countries within the meaning

of section 911 (a) (1) of the Internal Revenue Code of 1954 [2] so as to exempt from taxation the amounts received for his artistic services from sources outside the United States.[3]

The question is one of fact and each case must be decided in light of its particular circumstances. *Donald H. Nelson*, 30 T.C. 1151, 1153 (1958).

The legislative history of section 911 (a) (1) and its predecessors makes it clear that the mere fact that a taxpayer is not residing in the United States does not demonstrate that he is a bona fide resident of a foreign country. By the Revenue Act of 1942, 56 Stat. 798, Congress specifically changed the test for exemption from one of nonresidency in the United States to the stricter test of bona fide residency elsewhere. See S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 54, 116 (1942), 1942–2 C.B. 504, and Conf. Rept. No. 2586, 77th Cong., 2d Sess., p. 44 (1942), 1942–2 C.B. 701. The Congress also stated that the tests to be applied in determining whether a taxpayer is a bona fide resident of a foreign country or countries will be those generally applicable in ascertaining whether an alien is a resident of the United States. See sec. 1.911–1 (a) (2), Income Tax Regs.

Residence is defined in section 1.871–2 (b), Income Tax Regs., as follows:

(b) *Residence defined.* An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but, if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.

---

[2] SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.
(a) GENERAL RULE.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:
(1) BONA FIDE RESIDENT OF FOREIGN COUNTRY.—In the case of an individual citizen of the United States, who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph.

[3] There is no question that the amount of $205,840.03 is the type of income referred to in sec. 911 (a) (1).

In light of the above guidelines, in *Rudolf Jellinek*, 36 T.C. 826, 834 (1961), acq. 1964–1 (Part 1) C.B. 4, we stated that—

although "residence" does not require a permanent home, * * * or even a definite and settled abode, * * * it does require that the taxpayer have some degree of permanent attachment for the country of which he is an alien, * * * and it has been said that it is this degree of permanence of an individual's attachment for a country in which he is at some time physically present which determines whether he is a domiciliary, a resident, or a transient of the country; * * * [Citations omitted].

It is our opinion, having applied the above principles to the facts before us, that petitioner has not proven that he was more than a mere transient and we therefore hold that he is not entitled to the benefit of section 911(a)(1).

In our findings of fact we have endeavored to set forth in some detail petitioner's actions during the taxable year in question. It would serve no purpose to do more than comment upon them in this opinion. The evidence adduced at trial demonstrates that petitioner did not establish that degree of permanent attachment in any of the countries in question to have us conclude that he was a bona fide resident of any one of them. Rather, the record as a whole tends to support the position of the respondent, namely, that petitioner was no more than a mere transient.

Having carefully considered all of the evidence before us, we have concluded that the petitioner was present in each of the countries involved for limited periods in connection with specific projects. There is nothing in the record to suggest that petitioner intended an indefinite or extended stay. Petitioner, for example, was present in India solely for the purpose of the filming of a portion of a single motion picture. Other than this specific project, the record does not reveal that petitioner had any sort of connection existing between him and India which would suggest any kind of permanent attachment. See *Joseph A. McCurnin*, 30 T.C. 143 (1958). On this basis it cannot be said that petitioner was a bona fide resident of India. Consequently, because his stay in India included part of January 1962, it therefore cannot be said that he was a bona fide resident of a foreign country or countries for an uninterrupted period which includes the entire taxable year, 1962.

We think it to be significant that during the tax year in question petitioner's agent sought employment for him in the United States as well as in Europe. There is nothing in this record to suggest that petitioner would have refused any acceptable professional opportunity in the United States on the grounds that it would entail returning from Europe. In the absence of such evidence, we are not persuaded that petitioner intended other than to pursue his career wherever the opportunity presented itself, whether in this country or in Europe.

Such a factor operates to distinguish this case from our decision in *Leonard Larsen*, 23 T.C. 599 (1955), acq. 1955–1 C.B. 5, in which we found that the petitioner therein had undertaken to make a career of foreign employment. We therefore hold for the respondent on this issue.

The second issue for determination is whether petitioner is entitled to a deduction for unreimbursed business expenses in excess of the $38,703.32 allowed by the respondent. Petitioner contends that he is entitled to a deduction in the additional amount of $24,273.65 [4] for expenses relating to taxpayer's work as an actor and/or director while in Europe. The parties are agreed that the amount in question was actually expended by the taxpayer. The additional expenses claimed are as follows:

| | |
|---|---:|
| 1. Hotels, rent, and related items | $5, 361. 75 |
| 2. Food—all in London | 633. 59 |
| 3. Entertainment | 216. 29 |
| 4. Car rental, repair, and insurance—London | 1, 005. 51 |
| 5. Books and records | 374. 05 |
| 6. Secretarial (Stella Magee, et al.) | 3, 114. 32 |
| 7. Travel and related | 2, 982. 55 |
| 8. Publicity (London Press Clipping Service) | 31. 02 |
| 9. Cash expenses (hotel, rent, telephone, travel, automobile, postage, misc.) | 8, 646. 90 |
| 11. Bank charges | 5. 46 |
| 12. Reimbursement of advances withheld by employer | 846. 00 |
| 13. Payment to Stella Magee pursuant to her "Final Accounting" (secretarial) | 764. 21 |
| 14. Additional rental payments | 292. 00 |
| | 24, 273. 65 |

Section 162 provides:

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; * * *

The burden of proof is upon the petitioner with regard to each of the above expenses.

Petitioner contends that the expenses are deductible as travel expenses pursuant to section 162(a)(2).

In *Commissioner* v. *Flowers*, 326 U.S. 465, 470 (1946), the Supreme Court stated:

---

[4] Petitioner originally contended that the amount of $30,379.03 should be allowed; however, he has now conceded that the sum of $6,105.38 was properly disallowed by the respondent.

Three conditions must * * * be satisfied before a traveling expense deduction may be made * * *

    (1) The expense must be a reasonable and necessary traveling expense * * *

    (2) The expense must be incurred "while away from home."

    (3) The expense must be incurred in pursuit of business. * * *

We are of the opinion that petitioner has failed to meet his burden of proof on the third requirement. The record before us is entirely inadequate and insufficient. It is far too vague and general on the relation of these expenditures to his trade or business to sustain petitioner's burden. Other than the petitioner's general statement that the expenses were all connected with his work as an actor and/or director and the stipulation that the amounts had been expended, the record is barren of any explanation of the reason for all but the secretarial expenses. On the state of the record before us, we cannot conclude that the expenses in question were incurred in the pursuit of business.

Though we do not dispute the general statement that the petitioner was pursuing his trade or business while in Europe, we are not convinced that such statement is per se sufficient to endow all his expenditures with a business purpose. We are also aware that the respondent has allowed a substantial amount of petitioner's expenses incurred while in Europe and we think that in order to persuade us that he is entitled to a greater deduction the petitioner must do more than merely state that all the expenses were incurred in pursuit of business. In light of this failure of proof, we do not consider the two prior requirements.

With reference to the expenses incurred by petitioner for secretarial services, however, though it is a close question we believe that petitioner has met his burden of proof as to both business purpose and reasonableness. Stella Magee testified concerning her employment with petitioner in Europe, particularly in conjunction with the two screen plays, "O'Hoolihan's Jest" and "Death in Venice." We think that her testimony, though not as complete as we might desire, is adequate as to this particular expense. We, therefore, hold that the secretarial expenses are allowable as a deduction under section 162(a)(1).

In our consideration of the expense issue, we have endeavored to locate expenses which would be applicable to the specific trips which the record reveals petitioner made in conjunction with the screen plays "O'Hoolihan's Jest" and "Death in Venice." We have been unable on this record, however, to conclude that any of the claimed expenses can be said to apply specifically to one or more of these periods. The expense descriptions utilized by petitioner are again too vague and general to enable us to do so.

We therefore hold that, on the record before us, with the exception of the secretarial expenses, petitioner has not shown that he is entitled to a deduction in excess of the amount allowed by the respondent.

*Decision will be entered under Rule 50.*