WILLIAM N. DILLIN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

PATREA L. DILLIN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT [1]

Docket Nos. 5050–67, 5051–67.   Filed May 6, 1971.

*David W. Richmond* and *Robert L. Moore II*, for the petitioners. *Louis F. Nicharot,* for the respondent.

---

[1] These cases were consolidated for purposes of trial, briefs, and opinion.

STERRETT, *Judge:* Respondent in his notices of jeopardy assessments determined deficiencies and additions to tax, under sections 6651(a) and 6653(a), I.R.C. 1954,[2] as follows:

|  | | Deficiency | Addition |
|---|---|---|---|
| William N. Dillin, docket No. 5050-67 | 1963 | $280,266.06 | $14,013.30 |
| | 1964 | 218,538.00 | 65,561.40 |
| | 1965 | 10,196.00 | 3,058.80 |
| Patrea L. Dillin, docket No. 5051-67 | 1963 | 127,635.49 | 6,381.77 |
| | 1964 | 100,191.00 | 30,057.30 |
| | 1965 | 4,320.00 | 1,296.00 |

Although there is one basic issue for decision, the respondent's determination presents several different questions: (1) Whether petitioner William N. Dillin was taxable on certain amounts because he was a U.S. citizen at the time he engaged in the activity which gave rise to the pertinent payments; (2) if the answer to the first question is negative, whether petitioner William N. Dillin was a nonresident alien at the time he received the payments; (3) if William N. Dillin was a nonresident alien the respondent contends that the amounts in question were from sources within the United States; and (4) whether Patrea L. Dillin was taxable upon one-half of the amounts in question by virtue of the Texas community property law. In addition, we are called upon to decide whether respondent erred in determining certain additions to the tax of both petitioners.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations and the exhibits attached thereto are incorporated herein by this reference.

Petitioners William N. Dillin (hereinafter referred to as Dillin) and Patrea L. Dillin (hereinafter referred to as Patrea), husband and wife, resided in Nassau, Bahamas, at the time their petitions were filed herein. For the taxable year 1963, Dillin filed a U.S. Nonresident Alien Income Tax Return; Patrea filed a separate U.S. Individual Income Tax Return. On these returns the petitioners reported income on a community property basis, and used the cash receipts method of accounting. Neither petitioner filed a Federal income tax return for 1964 or 1965.

Petitioners have been married since January 1951. From approximately 1952 until September of 1963 the petitioners resided in Corpus Christi, Tex. On his Federal income tax return for 1963 Dillin, who was an attorney at law not engaged in its practice, stated his occupation as oil operator. Dillin was not a petroleum engineer or a geologist.

---

[2] All references by section are to the Internal Revenue Code of 1954 unless otherwise stated.

He had never owned any producing oil or gas wells. A considerable part of his activity as an oil operator was in engaging as a landman, in negotiating oil and gas leases. When a landman acts for an oil company, the company designates the parcels of realty that it is interested in and sets the maximum purchase price it is willing to pay.

In May of 1958, Dillin went to Washington, D.C., on a business trip and while there phoned Charles F. O'Neall (hereinafter O'Neall), a close friend of his. O'Neall told Dillin that he was going to go to Argentina the following day to investigate the possibilities of a real estate transaction there. During this conversation O'Neall stated that Argentina had recently elected a new President and that Argentina had great need for crude oil. He told Dillin that he had a friend and associate, Antonio Angel Diaz (hereinafter Diaz), who could assure a hearing before Yacimientos Petroliferos Fiscales (hereinafter YPF), a Government agency which had ownership and control of substantially all Argentine oil rights. YPF was in charge of all oil production, distribution, and marketing, and was authorized to conduct business on its own or through Argentinian or foreign companies. O'Neall suggested that he and Dillin "should get together and do some sort of oil deal down there," and that Dillin should think of an oil operator who might be interested in an Argentine concession. Subsequently, O'Neall called from Buenos Aires, Argentina, and stated that the prospects looked favorable and that Dillin should contact an oil operator who would be interested.

The day following this conversation, Dillin went to the offices of Paul R. Turnbull (hereinafter referred to as Turnbull) and Frank P. Zoch, Jr. (hereinafter referred to as Zoch), who operated a domestic oil-drilling company in Corpus Christi, Tex. He spoke to Turnbull, who stated that their company would not be interested in a concession arrangement but would be interested in a drilling contract should one become available.

When O'Neall returned from Argentina he informed Dillin that a drilling contract was possible. Dillin then contacted Zoch who arranged a meeting in Dallas, Tex., at the offices of Southeastern Drilling Corp. (Southeastern Dallas), a domestic drilling company which during 1958 operated from 8 to 10 rigs in the United States. Southeastern Dallas and/or its shareholders and subsidiaries were involved to some extent in foreign drilling operations in Trinidad, Iran, Pakistan, India, and Borneo.

In July of 1958, a meeting was held in the offices of Southeastern Dallas in Dallas; Dillin, O'Neall, Zoch, and Turnbull attended, as did William P. Clements, Jr. (hereinafter referred to as Clements), the president and chief executive officer of Southeastern Dallas, and

Spencer Taylor, a vice president. At this meeting O'Neall indicated that he had information with respect to a developing oil program in Argentina. He stated that he had done legal work for Diaz (O'Neall was an attorney), who was in the newsreel business in Argentina, and that Diaz had close personal contact with YPF officials. O'Neall said that YPF needed help in drilling wells and that he thought Diaz could be of assistance in obtaining a drilling contract.

During a break in this meeting the participants, excluding O'Neall and Dillin, decided that although they were unsure of the merits of O'Neall's presentation it would be at least worthwhile to send Turnbull to Argentina in order to make a "reconnaissance" of the situation there.

When the meeting was reconvened, Clements indicated Southeastern Dallas' interest and proposed that Dillin and O'Neall be paid 20 percent of the net profits of any drilling contract that was obtained after all debts and expenses were paid. No salaries of the officers of Southeastern Dallas were to be paid from Argentine proceeds, but, any traveling expenses of Southeastern Dallas' personnel would come from net profits. O'Neall and Dillin agreed and O'Neall stated that 10 percent would be divided between himself and Dillin and the other 10 percent would go to Diaz.

At this meeting Clements stated that he would be pleased with a contract that employed one rig for a period of 2 years. He stated that future profits would come from future contracts. The agreement of the parties was not reduced to writing at this time.

After the meeting of July 1958, Dillin returned to Corpus Christi. It was not contemplated that he would have further duties. Dillin expected to help in any necessary manner but he felt that his "main job had been done;" i.e., to select and interest a competent drilling contractor. At the July meeting O'Neall stated that he would go to Argentina immediately; there was no discussion of specific actions to be taken.

Shortly after the July meeting Turnbull and O'Neall went to Argentina. Turnbull was charged with making a more or less superficial evaluation of the situation. O'Neall went to assist Turnbull and to act as his interpreter. Neither Turnbull nor O'Neall had authority to act for Southeastern Dallas.

During his stay in Argentina, Turnbull reported that he met with Dr. Arturo Sabato (hereinafter referred to as Sabato), who had been appointed by President Frondizi in May of 1958 as his personal delegate to YPF.[3] During the course of discussions, Turnbull further reported, Sabato indicated that he would extend an invitation to South-

[3] In November of 1958 YPF was reorganized and Sabato was appointed Director General.

eastern Dallas to come back to Argentina for an indepth study. In January of 1959 Clements asked O'Neall to discontinue his efforts on behalf of Southeastern Dallas. Within less than 1 month after Turnbull's return from Argentina, Southeastern Dallas received Sabato's invitation to come to Argentina in order to make further studies.

On October 7, 1958, John W. Rhea, Jr. (hereinafter referred to as Rhea), executive vice president of Southeastern Dallas, a petroleum engineer with some foreign drilling experience, went to Argentina on behalf of Southeastern Dallas. He was to go to the Comodoro Rivadavia area of Argentina, about 1,500 miles south of Buenos Aires, to visit field operations of YPF. He was to determine drilling conditions, cost data, and other necessary information. He was not authorized to make any commitments for Southeastern Dallas. After he had completed his study he was to return to Buenos Aires and report to Clements by telephone.

A few days after his arrival in Argentina, Rhea met with engineer Soifer, who was in control of matters relating to drilling and production for YPF. Rhea assured Soifer that Southeastern Dallas was both competent and interested. After gathering the necessary information with an engineer named Len Donny, who had worked with YPF in the past, Rhea returned to Buenos Aires and telephoned Clements. He suggested that Clements join him in Argentina.

In late October 1958, Clements went to Buenos Aires to confer with Rhea and to meet with YPF officials. After studying the information that Rhea compiled, Clements agreed that it would be worthwhile to submit a proposal for a drilling program and to negotiate a contract with respect to the considerable oil development contemplated by YPF.[4]

On October 29, 1958, a written proposal in the name of Southeastern Drilling Co. of Argentina, S.A. (hereinafter referred to as Southeastern Argentina),[5] was submitted to YPF. This proposal was drafted by Clements, Rhea, and Oscar Elkin, Southeastern Dallas' Argentine attorney. The proposal outlined three alternate plans: (1) Southeastern Argentina would drill wells on a turnkey basis; i.e., a flat rate of

[4] In a manner not made clear by the parties it was discovered that YPF anticipated a great many more wells being drilled than was thought at the time of the July 1958 meeting in Dallas.

[5] There is some confusion in the record as to whether certain acts were performed by individuals on behalf of Southeastern Drilling Co. of Dallas, or on behalf of Southeastern Drilling Co. of Argentina, S.A., or on behalf of the individuals involved. Wherever possible we have attempted to identify the parties but on occasion we found it necessary to refer to the whole melange as the Southeastern Group or Southeastern. The Southeastern Drilling Co. of Argentina, S.A., was incorporated on Apr. 1, 1959, and dissolved on Dec. 23, 1963. It appears that actions were taken in the name of Southeastern Argentina prior to its incorporation. Indeed as it appears *infra,* payments were made to Dillin from an account of Southeastern Argentina subsequent to the corporation's dissolution.

$85,000 per well, equipment to be supplied by the driller; (2) a day-work basis with a set fee per day and an additional amount per foot or meter; and (3) a straight meterage basis.

Prior to and subsequent to the submission of the written proposal Clements met on many occasions with YPF officials. Initially Clements and Rhea met with Sabato; on subsequent occasions they met with Soifer and one Peters, the operating manager engineer of YPF. During meetings with Soifer and Peters, the format of the Southeastern proposal was discussed. YPF was interested in Southeastern Argentina's proposal as an alternative to a proposal by a company known as Atlas Corp. to drill 4,500 wells. YPF officials stated that they did not feel that the Atlas proposal was in the best interest of the country and Soifer indicated that Southeastern Argentina's proposal would be helpful in justifying the rejection of Atlas.

At an undetermined date prior to October 29, 1958, Clements and Rhea were informed by YPF officials that it was impossible for YPF to directly negotiate a contract with Southeastern Argentina; public tender of bids was required. In November of 1958, the YPF underwent reorganization. It was thereafter composed of a president, board of directors, and a director general (Sabato). Prior to the reorganization, Sabato's power was absolute; after the reorganization there were many problems that he could not resolve without board approval. After November of 1958 when YPF determined to require public tenders for drilling contracts, directly negotiated contracts were not possible. YPF officials however stated that they, nonetheless, desired Southeastern Argentina's proposal as an alternative to the Atlas proposal and to establish the limits of a public tender.

Subsequent to the submission of the written proposal several meetings were held between YPF officials and Clements and Rhea at which the proposal was discussed in detail. Officials of the YPF indicated that they were pleased by the proposal. The proposal was unique to the YPF in that it provided for a contractor coming to Argentina with its own equipment and drilling a specified number of wells during a limited period of time.

Clements returned to the United States in mid-November of 1958. In the first week or 10 days of December he was informally advised that a public tender would be held by YPF; in the latter part of December it was officially announced. In early January of 1959, the tender documents were made available and Southeastern Argentina obtained them through the YPF office in New York.

From the time of the meeting of July 1958, and extending to a time well after the submission of a written proposal to the YPF, Dillin had no contact with Clements, Rhea, Turnbull, or any other South-

eastern representative. O'Neall was Dillin's only source of information. Dillin never saw a copy of the written proposal submitted to YPF, he was merely informed by an unidentified party that such a proposal had been made. By December of 1958 O'Neall had told Dillin that YPF held the Atlas option for the drilling of 4,500 wells in the Comodoro Rivadavia region and that YPF did not wish to exercise that option. After the first of December 1958, the date upon which the option was exercisable, Dillin was told that YPF had not exercised it.

Dillin learned that YPF did not intend to exercise its option and that it intended to let drilling contracts covering 2,000 or more wells. He also learned that the Southeastern Group had stated that it was only interested in drilling 1,000 wells. He, then, approached Ralph Storm and inquired whether he and his brother Jim would be interested in a contract to drill some of these wells, over and above the first 1,000. Ralph Storm indicated that they would be interested.

Shortly thereafter Dillin traveled to Argentina, he remained there from December 16, 1958, to January 1, 1959. This trip was not at the request of anyone associated with Southeastern Argentina or Southeastern Dallas; Dillin was not reimbursed by these companies for his expenses and he was not authorized to act on their behalf. Diaz, who met Dillin a few days prior to his trip, furnished him with an airline ticket and Ralph Storm reimbursed him for his expenses. Diaz supplied Dillin with an interpreter in Argentina named Norman Pentreth. Dillin did not speak Spanish. At the time of this December trip Dillin was unaware that a public tender would be necessary and that a negotiated contract was not possible.

During this first trip to Argentina, Dillin had a series of meetings with officials of the YPF and with other Government officials. He met with the "head" of the Industrial Bank of Argentina, which provided funds for YPF's activities. He had a brief meeting with Sabato in Buenos Aires. On two subsequent occasions Dillin met with Sabato at Mar del Plata, an Argentinian sea resort; on at least one of these occasions the meeting took place in Diaz' apartment there. At these meetings, and at several other meetings with Sabato, Dillin expressed his interest in the Southeastern contract and inquired as to what the general situation was. Sabato did not discuss details concerning the contract nor the "philosophy" of it. Sabato could not assure Dillin that Southeastern would receive a contract because YPF required public bids.

On January 14, 1959, a meeting was held in Dallas at which the Southeastern Group's bid at the forthcoming public tender was discussed. Dillin, Clements, and others were present at this meeting.

On January 23 or 24, 1959, Clements went to Argentina in connection with the submission of the Southeastern Group's bid. Clements plannned to complete preparation of the bid while in Argentina. Prior to this time a lot of effort had been expended in the United States on preparation of the bid, developing labor costs, expanding on the information that Rhea had gathered, and obtaining new information from YPF.

Shortly after Clements' arrival in Buenos Aires, Diaz arranged a luncheon meeting at his home with Sabato. Dillin was also present at this meeting. Dillin was not present at Clements' request; in fact, Clements had indicated to O'Neall and Dillin that he did not want their assistance in Argentina. Dillin had returned to Argentina on or about January 23, 1959, to open negotiations for the Storm brothers whom he had contacted on his return from his December trip. The expenses of his January trip were also paid by the Storm brothers and his airline ticket was again furnished by Diaz.

At this luncheon meeting Clements questioned Sabato on two or three specifics pertinent to the proposed bid. Dillin remained during the meeting but he was of no assistance.

In preparing to submit a bid at the public tender on behalf of Southeastern Argentina, Clements frequently met with engineers Soifer and Peters and on one other occasion with Sabato. Dillin did not provide any assistance or information in connection with the preparation of the bid.

On February 13, 1959, at the request of Diaz, Dillin and others signed a letter form agreement with Southeastern Argentina in Clements' hotel room in Buenos Aires. The agreement was requested by Diaz to formalize the oral agreement reached in July of 1958. It provided in essence that should Southeastern Argentina receive a contract as a result of its bid 20 percent of the net profits from the resulting 3-year contract, as well as net profits derived from future use of the same drilling equipment, would be divided and paid as follows:

|  | Percent |
|---|---|
| Diaz | 4 |
| O'Neall | 5 |
| Dillin | 5 |
| D. D. T. Houston ⎱ R. F. Houston ⎰ | 6 |

On February 13, 1959, the bid of Southeastern Argentina for 1,000 wells was submitted at public tender. The bid provided for performance under a meterage and daywork basis. There were approximately 10 or 12 other bids submitted.

The bids submitted at the public tender were submitted under seal

and became public information when opened by YPF. Each participant was free to look into the bids that had been presented by the others. The bids were then studied by a committee which had been appointed by the YPF division of drilling. This committee, which was composed of engineers, geologists, and representatives of the legal and accounting departments of YPF, was presided over by Peters. Costs, financing, economics, time, and company backgrounds were considered. The committee then submitted a report to the manager of the drilling section who concurred in the committee report and then submitted his own report to Sabato who after conferring with Soifer· agreed and in turn submitted it to the board of directors, recommending that a contract be awarded to Southeastern Argentina. The 15-man board of directors [6] unanimously voted to award the contract to Southeastern Argentina. The bid of Southeastern for 1,000 wells was formally accepted in March of 1959.

All bids submitted at the public tender were considered in the same manner. Bids were accepted on a purely competitive basis. The bids of Kerr McGee for 500 and of ENI (an Italian Government concern) for 300 wells were also accepted. The drilling company of Jim and Ralph Storm, Storm Drilling Co., did not receive a contract.

Contract negotiations began shortly after the acceptance of the Southeastern Argentina bid. These negotiations continued for a period of almost 2 months. Southeastern Argentina was represented by Clements, Rhea, Elkin, and Tom Rhodes, an attorney for Southeastern Dallas. YPF was represented by Peters, as chief negotiator, Soifer and several engineers, lawyers, and accountants. Dillin did not participate in the contract negotiations and had no knowledge of the terms of the contract until he was informed of them by Clements.

On April 29, 1959, a drilling contract for 1,000 wells to be drilled in 4 years [7] from September 1959 was signed. The contract was ratified by various legislative, executive, and financial departments of the Government of Argentina in September of 1959.

Drilling pursuant to the contract of April 29, 1959, began in late 1959, and drilling was completed by Southeastern Argentina in August 1963.

After the drilling was completed, toward the end of 1963, Southeastern began to make payments under the agreement of February 13, 1959. Southeastern Argentina did not receive full payment until 2 years after drilling was completed, and for this reason payment under the agreement continued until November of 1965.

---

[6] Each board member had one vote. The board was composed of the president and director general of YPF, representatives of the oil provinces, and representatives of the armed forces.

[7] The agreement of Feb. 13. 1959, mentioned a 3-year contract.

Dillin has received payments by checks drawn on an account of Southeastern Agentina arising out of the agreement dated February 13, 1959, as follows:

| Check dates | Amount | Check dates | Amount |
|---|---|---|---|
| Oct. 1, 1963 | $268, 095. 24 | Dec. 2, 1964 | $4, 000. 00 |
| Nov. 14, 1963 | 28, 000. 00 | Jan. 6, 1965 | 2, 800. 00 |
| Dec. 23, 1963 | 28, 000. 00 | Feb. 1, 1965 | 2, 400. 00 |
| Jan. 15, 1964 | 28, 000. 00 | Feb. 26, 1965 | 2, 800. 00 |
| Feb. 11, 1964 | 28, 000. 00 | Apr. 2, 1965 | 2, 800. 00 |
| Mar. 6, 1964 | 28, 000. 00 | Apr. 30, 1965 | 2, 800. 00 |
| Apr. 13, 1964 | 40, 000. 00 | June 2, 1965 | 2, 000. 00 |
| May 8, 1964 | 40, 000. 00 | June 30, 1965 | 2, 800. 00 |
| June 12, 1964 | 40, 000, 00 | July 30, 1965 | 2, 800. 00 |
| July 10, 1964 | 32, 000. 00 | Sept. 2, 1965 | 2, 400. 00 |
| Aug. 11, 1964 | 28, 000. 00 | Sept. 30, 1965 | 2, 800. 00 |
| Oct. 8, 1964 | 20, 000. 00 | Nov. 2, 1965 | 2, 400. 00 |
| Nov. 17, 1964 | 20, 000. 00 | | |
| | | | 660, 895. 24 |

A payment in the amount of $11,904.76 was made to Dillin in September of 1959 as a so-called "signing bonus," actually an advance against future payments.

Two percent of the net profits as defined by the agreement of February 13, 1959, was placed in escrow by Southeastern Argentina. The reason given by the company was that Dillin and O'Neall each assigned a 1-percent interest in the agreement. These amounts are in escrow pending the resolution of a controversy between Dillin, O'Neall, and Diaz.

In 1962 Dillin employed counsel in Corpus Christi to obtain immigration laws and tax statutes with a view towards emigration. This culminated in Dillin's decision in 1963 to immigrate to the Bahamian Islands.

On August 2, 1963, Dillin wrote to Southeastern Dallas from Corpus Christi that he had authorized the accounting firm of Lybrand, Ross Bros. & Montgomery to inspect the company's records in order to determine the approximate amount and date of initial distribution of proceeds of the agreement of February 13, 1959. By letter dated August 8, 1963, Rhodes informed Dillin that inspection of records would not be permitted, that computation of net profits was not possible, and that no date for initial distribution had been determined.

By letter dated September 16, 1963, Dillin stated that he had been advised that distribution would be made on October 1, 1963. He requested that his payment be sent to 481 Olmos Drive East, San Antonio, Tex. The Texas address was that of his mother-in-law and father-in-law. At this time the petitioner was in the midst of moving to Nassau, Bahamas, and did not yet have a post office address. A

letter dated October 1, 1963, and addressed to Dillin at the 481 Olmos Drive East address and signed for Southeastern Argentina by Rhodes stated that payment of $268,095.24 was being made therewith. The letter stated that this amount represented 4 percent of $7 million less the advance of $11,904.76 previously received by Dillin.

Prior to this, in August of 1963, Dillin had gone to the Bahamas. He made arrangements with a real estate broker for a place to live and he arranged for a school for his two children. He also consulted an attorney concerning an application for residence. On September 6, 1963, he filed an application for a residency permit. By letter dated October 29, 1963, addressed to his attorney, Dillin was notified by the Department of Immigration that he had been granted permission to remain in the Bahamas for 1 year "in the first instance."

At sometime after September 6, 1963, Dillin returned to the United States. He sold his house in Corpus Christi, closed his bank accounts and transferred the funds to Nassau. He resigned from the clubs he had belonged to and told his friends he was leaving permanently. On approximately September 13 or 14, 1963, he drove with his family to Miami, Fla., and traveled by boat from there to Nassau, arriving there on September 16, 1963.

Upon their arrival in Nassau, Dillin and his family lived in a furnished apartment for 2 weeks, rented on a weekly basis. Dillin and his family then moved into a furnished house where they remained for approximately 3 months. They then moved into a furnished apartment where they lived for approximately 3 years. Finally Dillin and his family moved into an unfurnished three-bedroom apartment of 2,200–2,500 square feet where, at the time of trial, they have lived for 3 years. Since mid-September 1963, Dillin has not rented living quarters in the United States, with the exception of an apartment he rented for 1 month in Corpus Christi during 1964.

Both petitioners were born citizens of the United States. On September 26, 1963, Dillin appeared before the United States vice consul in Nassau and executed an oath of renunciation of the nationality of the United States. The Certificate of Loss of Nationality of the United States executed by the vice consul, dated October 3, 1963, stated that Dillin expatriated himself on September 26, 1963. Patrea did not renounce her citizenship. Her parents were elderly and in poor health and she wished to visit them if their health should deteriorate. The petitioners mistakenly believed that if she became expatriated she would not be permitted to leave the Bahamas for 5 years.

On October 30, 1963, Dillin obtained a Certificate of Identity from the Colonial Secretary's Office, Bahamas. The certificate states that its sole purpose is to provide the holder with identity papers in lieu of a national passport.

On November 14, 1963, the Consulate General of the United States issued a nonimmigrant B–2 visa to Dillin for travel to the United States.

Dillin traveled to the United States and remained there as follows:

| Departure from Bahamas | Remained until |
|---|---|
| Nov. 20, 1963 | Nov. 25, 1963 |
| Dec. 19, 1963 | Jan. 3, 1964 |
| Feb. 9, 1964 | Feb. 16, 1964 |

On several other occasions Dillin traveled to the United States. In March 1964 he attended a meeting in Dallas. On April 25 or 26, 1964, Dillin entered the United States and spent approximately 60 days in Texas. During this period he had meetings with representatives of Southeastern Dallas.

From September 16, 1963, to October 6, 1964, Dillin and Southeastern Dallas and these parties' representatives exchanged correspondence concerning the amount of payments due Dillin and concerning the net profits from the YPF drilling contract. The computation of net profits was, at the time of trial, in controversy in an action pending in the U.S. District Court for the Northern District of Texas.

In filing income tax returns for 1963 the petitioners reported income on a community property basis. On his alien income tax return for 1963 Dillin reported one-half of his gross income from his occupation as an oil operator, in the amount of $5,840.59. Dillin did not report any of the amounts paid him under the agreement of February 13, 1959. On her U.S. Individual Income Tax Return for 1963, Patrea reported the other one-half of Dillin's gross income from the occupation of oil operator. She did not report any income from the payments made under the agreement of February 13, 1959.

### OPINION

It is Dillin's position that amounts he received during 1963, 1964, and 1965 were not includable in gross income by virtue of section 872(a),[8] because during the years in question he was a nonresident alien and the compensation he received was from personal services performed without the United States and hence, under section 862(a)(3),

---

[8] In 1966 the Foreign Investors Tax Act made some fundamental revisions in this area of the Code, such as the introduction of the concept of "effectively connected" income. However, as noted in H. Rept. No. 1450, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 1007, accompanying H.R. 13103, 89th Cong., 2d Sess. (1966), which on enactment became the Foreign Investors Tax Act, "Existing law does not require a determination as to whether income is, or is not, effectively connected with the conduct of a trade or business within the United States by a nonresident alien individual or by a foreign corporation." The change was made effective for years beginning after Dec. 21, 1966. All citations to the Internal Revenue Code, as well as to the Income Tax Regulations, in this opinion refer to said sections as they existed in the years before the Court.

was non-U.S. source income. The respondent argues (1) that Dillin was a U.S. citizen when he performed the services for which he was compensated and should, therefore, be taxed as a citizen; (2) that Dillin was a U.S. resident [9] when he received the compensation; (3) that the compensation was for services performed within the United States under section 861(a)(3) and is therefore taxable under section 871; and (4) that one-half of the amounts received by Dillin are includable in the income of Patrea by virtue of Texas community property law. Tex. Rev. Civ. Stat. Ann., art. 4619. The final question for our determination is whether the respondent was justified in imposing penalties under section 6651(a) and 6653(a).

The parties are essentially in agreement as to the facts giving rise to the respondent's first argument. During 1958 and 1959, Dillin performed certain services.[10] By oral agreement entered into in July of 1958 and reduced to writing, with certain modifications, on February 13, 1959, Dillin was to receive 5 percent of the net profits from any contract entered into by Southeastern Argentina and YPF for the drilling of 1,000 oil wells in Argentina arising out of YPF's tender of February 13, 1959. The amount of net profits from this contract could be finally determined no earlier than the last months of 1963. In September of 1963, Dillin learned that distribution under his agreement with the Southeastern Group would begin on October 1, 1963. On September 26, 1963, Dillin renounced his U.S. citizenship in Nassau, Bahamas, before the United States vice consul. Prior to this, on or about September 16, 1963, Dillin and his family moved to Nassau and have continued to live there up to and including the time of trial.[11] On or after October 1, 1963, Dillin received the first payment under his agreement with the Southeastern Group. He received the last payment in controversy here on or after November 2, 1965.

From these facts the respondent contends that since Dillin was a citizen at the time he earned the amounts in question he should be taxed as a citizen. Although the petitioner admittedly renounced his U.S. citizenship for the sole purpose of avoiding Federal taxation, his "motive to avoid taxation will not establish liability if the transaction does not do so without it." *Sidney L. Olson*, 48 T.C. 855, 870 (1967). The essence of respondent's position is that section 872 requires the taxpayer to have been an alien at the time the income in question was earned. We have been unable to find authority in support of this theory in either the decided cases or the pertinent legislative history.

We do not presume to doubt, as the respondent points out on brief,

---

[9] Sec. 1.871–1, Income Tax Regs. "Resident aliens are, in general, taxable the same as citizens * * *."

[10] The nature of these services are in controversy, and will be discussed *infra*.

[11] The question of Dillin's residency for purposes of Federal taxation will be discussed *infra*.

that "The taxing power of Congress * * * is exhaustive and embraces every conceivable power of taxation." *William Waller*, 39 T.C. 665, 679 (1963). Nor do we deny that Congress' power to tax is not limited to the geographical confines of the United States. *Cook v. Tait*, 265 U.S. 47( 1924). However, under certain circumstances Congress has legislated to delimit that power to tax. In the case at bar we find that Dillin, initially at least, has fallen heir to such a limitation.

During all of the periods in question Dillin employed the cash receipts method of accounting. It is axiomatic that a cash basis taxpayer is chargeable with income upon actual or constructive receipt [12] and that the time of earning is immaterial. In *Julian C. Stanford*, 34 T.C. 1150 (1960), affd. 297 F. 2d 298 (C.A. 9, 1961), and *J. A. C. Steur*, 7 T.C. 1075 (1946), we were faced with situations the obverse of the instant case. In *Stanford*, the petitioner *earned* certain pension payments while he was a German citizen and resident. Payments were *received* by the petitioners husband and wife after they had become U.S. citizens. On these facts we held that section 872(a) did not apply, because at the time the amounts in question were received the petitioners were citizens and not nonresident aliens.[13] *Julian C. Stanford, supra* at 1159. The *Steur* case presented similar circumstances. The petitioner performed services as a nonresident alien on a commission basis. Prior to the time when his commission could be determined he became a U.S. resident. After he became a resident he *received* certain payments attributable to these services. In holding that the petitioner was taxable as a U.S. resident we noted that he kept his books and made his income tax return on a cash basis and that the amounts in controversy did not become available to him until after he became a resident. *J. A. C. Steur, supra* at 1080–1081.

Although, as we stated above, both of these cases are logically obverse to the instant case, their governing rationales are that the taxpayer's status at the time of receipt is controlling. This principle is equally applicable here. Cf. *James D. Mooney*, 9 T.C. 713 (1947) ; *Ingram v. Bowers*, 47 F. 2d 925, 927 (S.D. N.Y. 1931), affd. 57 F. 2d 65 (C.A. 2, 1932).[14]

---

[12] The respondent did not raise any arguments concerning the doctrine of constructive receipt. In fact, such an argument would have had no justification in view of the fact that the amount of Dillin's income could not have been determined until the Southeastern Group was able to account for its net profits.

[13] In *Julian C. Stanford*, 34 T.C. 1150, 1159 (1960), we stated : "To qualify under the provisions of section 872(a), income received by a nonresident alien from sources without the United States must be not only earned but also received by the taxpayer while he actually is a nonresident alien." In *Stanford*, the petitioners argued that the payments were earned outside of the United States and our major concern was with citizenship at time of receipt. In that respect the language quoted above is *obiter dictum*.

[14] We cannot help but note that respondent himself has taken the position in I.T. 3926, 1948–2 C.B. 48, and G.C.M. 9064, X–1 C.B. 314, declared obsolete by Rev. Rul. 67–406, 1967–2 C.B. 420, 424, that, when a U.S. citizen became a nonresident alien during a taxable year, income received after the change in status would be taxed pursuant to provisions concerning nonresident aliens.

In his second line of attack the respondent contends that Dillin was a U.S. resident during the years in question and, therefore, section 872(a) is not applicable. Dillin argues that he had become a resident of the Bahamas. The question of residency is one of fact, and each case must be decided upon it own facts and circumstances. *Jose V. Ferrer*, 50 T.C. 177, 182 (1968), affirmed per curiam 409 F. 2d 1359 (C.A. 2, 1969); *William E. Adams*, 46 T.C. 352, 358 (1966).

It is true that Dillin did not immediately obtain quarters of a permanent nature upon his arrival with his family in the Bahamas on September 16, 1963, but he did establish a home of a temporary nature and he did ultimately procure a large, unfurnished apartment. Furthermore, he arranged for his children's schooling and applied for and received from the Government of the Bahamas permission to reside there. He and his family have continued to reside in the Bahamas from September 16, 1963, until the time of trial.

As the respondent argues on brief, the fact that Dillin was a resident of the Bahamas does not affect the possibility that he may also have been a U.S. resident. It is well established that an individual may have more than one residence. *Rudolph Jellinek*, 36 T.C. 826 (1961). In this case, however, Dillin intended the Bahamas to be his sole residence and he effectively abandoned his U.S. residence. As we set forth in our Findings of Fact, Dillin disposed of his house in Corpus Christi, he closed his bank accounts and transferred the funds to Nassau, he resigned from his clubs, and informed his friends that he would not return. These actions clearly indicate his intention to abandon his U.S. residence as well as his intention to commence residency in the Bahamas. "Intention carries great weight in determining whether a residence *once established* has been abandoned * * *." *William E. Adams*, *supra* at 361. And perhaps we should emphasize that under section 872(a) we are concerned not with whether the taxpayer has established a foreign residence, but, rather, with whether he has ceased to be a U.S. resident. The fact of a foreign residence is merely to be considered as one circumstance indicating lack of a U.S. residence. In this regard we find Dillin's expatriation a persuasive factor of his intent to abandon U.S. residency.

After considering all facts and circumstances presented herein it is our determination that Dillin has carried his burden of proof.[15] He has shown by sufficient evidence that he was, during the years in issue, a nonresident of the United States.

---

[15] In view of our determination that Dillin has carried his burden of proof we need not decide whether the presumption of nonresidency described in sec. 1.871–4(b), Income Tax Regs., is applicable here. The regulation provides that, "An alien, by reason of his alienage is presumed to be a nonresident alien." We have some doubts that this presumption attaches to an expatriated U.S. citizen.

On brief the respondent places great emphasis on the various visits Dillin made to the United States during 1963 and 1964. Several of these were for comparatively short periods and one was for a period of approximately 60 days. In addition, Dillin rented an apartment in Corpus Christi for 1 month during 1964. The respondent's regulation section 1.871–2(b) provides that a "mere transient or sojourner" in the United States is not a resident. Further, the regulation states that "One who comes * * * for a definite purpose which * * * may be promptly accomplished is a transient." As we indicated in our Findings of Fact, Dillin's visits to the United States were, in large part, occasioned by his controversy with the Southeastern Group as to the amount of the net profits from the YPF contract. In view of the reasons for Dillin's visits, we find that he was a mere sojourner here. There was no intention on Dillin's part to maintain a U.S. residency, and both presence and intent are required. *William E. Adams, supra* at 361.

Furthermore, Dillin journeyed to the United States using a B–2 nonimmigrant visa. As the petitioners state, on brief, a B–2 visa is issued to aliens who are temporary visitors to the United States for business or for pleasure. See 22 C.F.R. sec. 41.12 (1970 ed.) and section 101(a)(15)(B), Immigration and Nationality Act, 66 Stat. 167, 8 U.S.C. sec. 1101(a)(15)(B). In order to obtain a B–2 classification an alien must show that his visit is temporary and that he has permission to enter a foreign country when he leaves the United States. 22 C.F.R. sec. 41.25 (1970 ed.). From this it appears that Dillin's sojourns in the United States were limited by the type of visa under which he traveled. The respondent's regulations state that when an alien's stay in the United States is limited to a definite period by the immigration laws, in the absence of exceptional circumstances, he is not a resident. Sec. 1.871–2(b), Income Tax Regs.

Having decided that during the years in question Dillin was a nonresident alien, we will now consider the respondent's third argument; i.e., that the amounts Dillin received from the Southeastern Group were from sources within the United States. Section 872 provided during 1963, 1964, and 1965 that the gross income of a nonresident alien includes only U.S.-source income. Hence, if we should find that Dillin's income was from sources without the United States, it would be exempt.

The parties agree and we concur that the income in question here was compensation for labor or personal services. Section 861(a)(3) provides, with an exception not applicable to this case, that "Compensation for labor or personal services *performed* in the United States," (emphasis supplied) shall be treated as U.S.-source income.[16] Thus,

---

[16] Sec. 862(a)(3), I.R.C. 1954, simply states the converse by providing that "compensation for labor or personal services performed without the United States" is non-United States source income.

our task is simply stated; we must decide whether Dillin performed the services for which he was compensated in the United States or in Argentina. The source of income is determined by the situs of the services rendered, not by the location of the payor, the residence of the taxpayer, the place of contracting, or the place of payment. *Karrer* v. *United States*, 138 Ct. Cl. 385, 394, 152 F. Supp. 66, 71 (Ct. Cl. 1957); *Ingram* v. *Bowers, supra;* sec. 1.861–4(a), Income Tax Regs.

The determination of the place of performance is a factual question. The evidence adduced by the parties was diametrically opposed in certain areas. At trial the respondent called as witnesses Clements, Rhea, and Sabato; the petitioners called only Dillin. The respondent's evidence indicated that the payments to Dillin were in the nature of a finder's fee, paid because Dillin brought to the Southeastern Group's attention the possibility of a drilling contract with YPF in Argentina. Clements testified that Dillin's services in Argentina were not sought nor were they desired. He testified that he had requested Dillin, as well as O'Neall, to desist from efforts in Argentina on Southeastern's behalf. Sabato's testimony indicated that Dillin did not render material assistance to the Southeastern Group in procuring the ultimate contract. Although Dillin testified that Clements wished him to go to Argentina in order to assure Southeastern's success, Dillin's expenses were not paid by the Southeastern Group and, in addition, it appears that Dillin went to Argentina to procure a contract for Storm Drilling. It was the Storm brothers who paid his expenses, with the exception of air fare which was provided by Diaz. Dillin's two trips to Argentina occurred after the Southeastern Group had submitted a written drilling proposal.

The baldest conflict in testimony is over the question of whether Dillin went to Argentina in December 1958 with the blessing of Clements or not. Dillin testified he did; Clements testified he did not. While we find Clements' testimony surprising in some respect, we do hold it to be credible. Dillin, on the other hand, we feel at the very least was guilty of inflating the value of his services in Argentina. It is apparent from his own testimony that Southeastern did not consult him with respect to the preparation or negotiation of the proposal, bid, or contract itself. It almost follows from this concession alone that Southeastern did not consider Dillin to have a role of any significance in Argentina.

We cannot accept the contention that Dillin's mere "puffing" of the abilities of Southeastern during his 1958 visit to Argentina, mostly to total strangers through an interpreter, had a meaningful effect on the awarding of the contract. His testimony that Dr. Sabato, after having consulted with Clements and other authorized representatives

of Southeastern on many occasions, came to his hotel room, out of the presence of Clements and the others, to have Dillin work on the Southeastern bid we find incredible. Particularly when it is recalled that Dillin admitted that he played no part whatsoever in drafting the terms of the very bid Dr. Sabato purportedly wanted him, as the representative of Southeastern, to explain. Furthermore, to accept Dillin's version is to find Sabato guilty of an impropriety and we find no independent basis for making such a finding.

A factor in our evaluation of the petitioner's testimony in comparison to that presented by respondent was Dillin's answers to certain written interrogatories propounded in connection with a proceeding in the U.S. District Court for the Northern District of Texas (Dallas Division) captioned "Antonio A. Diaz et al., Plaintiffs v. The Southeastern Drilling Co. of Argentina, S.A. et al., Defendants and Trefina, A.G. Intervenor." In his answer to one of these interrogatories Dillin stated that after the oral agreement of July 1958 "It was not contemplated that I would do anything further." This statement clearly indicates that Dillin understood that he was to be compensated for services already rendered prior to July of 1958; i.e., before he went to Argentina.

It may be that Dillin felt that his actions in Argentina were of material benefit to the Southeastern Group. It would not be the first time an individual has exaggerated his contribution to the success of a project. However, the record as a whole clearly indicates that Dillin was not compensated for his actions in Argentina, but rather was compensated only for his role in discovering the potential opportunity to the Southeastern Group.

In this regard the petitioners argue that the fact that Dillin received in excess of $660,000 refutes the respondent's contention that the compensation was in the nature of a finder's fee. However, it appears that as of the time of the July 1958 agreement the Southeastern Group had no expectation that the contract procured would be as large as in fact it turned out to be. The petitioners also argue that this being the case the contract was reduced to writing on February 13, 1959, at a time when the Southeastern Group was well aware of the size of the contract, and that the Southeastern Group would not have been willing at that time to pay Dillin such a large fee for merely informing Southeastern of the possibility of a future contract, but rather agreed to compensate him for his services in Argentina. We prefer another explanation; i.e., that the Southeastern Group was as of February 13, 1959, bound by the oral agreement of July 1958, and was merely carrying out its contractual obligation.

For the sake of completeness we note that section 863(a) provides

for allocation of gross income to sources within or without the United States. Section 863(a) states that this allocation is to take place under the respondent's regulations. Section 1.861-4(b), Income Tax Regs., provides as follows:

(b) *Amount includible in gross income.* If a specific amount is paid for labor or personal services performed in the United States, that amount (if income from sources within the United States) shall be included in the gross income. If no accurate allocation or segregation of compensation for labor or personal services performed in the United States can be made, or when such labor or service is performed partly within and partly without the United States, the amount to be included in the gross income shall be determined by an apportionment on the time basis; * * *

We are of the opinion that, based on the evidence submitted, any argument that Dillin performed services in Argentina and the United States and, therefore, received income from sources partly within and partly without the United States, could not prevail. Referring to the terms of the above-quoted regulation section, we find that we do not reach the question of apportionment described therein. As we have indicated heretofore all of the amounts in question were intended by the Southeastern Group to be for personal services performed in the United States. Although Dillin performed some service in Argentina this was not what he was compensated for.[17]

We must now turn our attention to the respondent's fourth contention. He argues that even if Dillin were allowed to exclude the amounts in question under section 872(a), one-half of said amounts are properly includable in Patrea's income by virtue of the community property law of Texas. Due to our holding that Dillin, as a nonresident alien was in receipt of U.S. source income, and, therefore taxable, resolution of this question in respondent's favor will result in a tax savings to the petitioners. If one-half of the amounts in question are taxable to Dillin and one-half to Patrea the graduated nature of the income tax rates will operate in the petitioners' favor.[18] On brief the arguments of both parties were not, in the main, concerned with the question of whether the amounts were community property under Texas law, but, rather assuming them to be community property, whether their hypothetical exempt character could pass over to the separate income tax return of a spouse who was a U.S. citizen. Our holding that these amounts were includable in gross income renders consideration of this point irrelevant.

There is no dispute between the parties that during 1958 and 1959 Dillin and Patrea were U.S. citizens and residents and domiciliaries

---

[17] Furthermore, in this case because Dillin performed services on an intermittent or sporadic basis, apportionment on the time basis suggested by an unquoted portion of the regulation would be inappropriate.

[18] We note that on brief the respondent did not assert this argument alternatively.

of the State of Texas. The ownership of income received from personal services is determined by the laws of the domicile of the earner at the time the income is earned. *Marie R. Owens*, 26 T.C. 77, 88 (1956). See also *W. F. Williams*, 51 T.C. 346, 348 (1968). In the case at bar Dillin was a domiciliary of Texas at the time he earned the income in question. The question to be answered is, thus, whether under Texas law Patrea, as of 1958, owned one-half of the amounts earned by Dillin and received by him in 1963, 1964, and 1965.

Section 1, art. 4619, Tex. Rev. Civ. Stat. Ann., provides that all property, with certain exceptions not applicable here, · acquired during marriage by either husband or wife is community property. Texas community property law has been broadly construed. *Lee* v. *Lee*, 112 Tex. 392, 247 S.W. 828, 832 (1923).

The term "acquired," as defined in the statute "refers to the origin or inception of the right or title rather than the completion or ripening of it." *Wrightsman* v. *Commissioner*, 111 F. 2d 227, 228 (C.A. 5, 1940), affirming 40 B.T.A. 502 (1939) ; Oakes, Speer's Marital Rights in Texas, secs. 387, 388 (4th ed. 1961). Even though the payment is contingent, as is the case here, there is a vested property right in the community. *Mora* v. *Mora*, 429 S.W. 2d 660, 662 (1968).

Under the applicable Texas law Patrea had a present, vested right in her community share of the proceeds of the agreement of July 1958. *Hopkins* v. *Bacon*, 282 U.S. 122 (1930) ; see also Oakes, Speer's Marital Rights in Texas, *supra*, sec. 207. Patrea was entitled to include said amounts in her gross income for 1963, 1964, and 1965. *Poe* v. *Seaborn*, 282 U.S. 101 (1930) ; *Hopkins* v. *Bacon, supra; Bender* v. *Pfaff*, 282 U.S. 127 (1930). The only theory argued by Patrea as a basis for excluding one-half of sums in issue from her income is that the income was exempt to Dillin and hence necessarily exempt to her. We have held against petitioners on this point by finding said income to be from U.S. sources. In view of this and our further holding that she had a vested right in said payments, it follows that one-half of said payments are includable in her income for the years before the Court. It further follows that Dillin is only taxable on the other half.

Finally, the respondent has asserted against both petitioners additions to tax under section 6651(a) for failing to file income tax returns for 1964 and 1965 and under section 6653(a) for negligent underpayment of tax for 1963, 1964, and 1965. We will first consider whether section 6653(a) is applicable.

Section 6653(a) provides an addition to tax of an amount equal to 5 percent an underpayment if said underpayment "is due to negligence or intentional disregard of rules and regulations." The question of negligence is one of fact upon which the petitioner has the burden

of proof. *Joseph Marcello, Jr.*, 43 T.C. 168, 182 (1964), affirmed on this issue sub nom. *Marcello* v. *Commissioner*, 380 F. 2d 499, 507 (C.A. 5, 1967). Due to the fact that the petitioners in the instant case did not, during any of the years in question, file joint income tax returns we must decide the question of negligence separately for each. After carefully considering all relevant circumstances, it is our determination that no part of any underpayment was due to either negligence or intentional disregard of rules and regulations. After Dillin became expatriated and abandoned his U.S. residence we are of the opinion that he, in good faith, believed himself exempt from U.S. tax. Since Patrea had no independent income during the years in question we do not find her negligent in relying upon her spouse's presumed exempt status. This case involved substantial questions of law and fact and as such we find that the petitioners were not negligent in failing to pay their taxes, their confusion was certainly not unreasonable. *J. Bryant Kasey*, 54 T.C. 1642, 1651 (1970), on appeal (C.A. 9, Feb. 22, 1971); *Douglas J. Lemery*, 54 T.C. 480, 490 (1970); see also *Joseph Marcello, Jr., supra* at 182.

Section 6651(a) imposes a maximum addition to tax of 25 percent for failure to file a required return "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." We hold that Dillin and Patrea failed to file returns for reasonable cause.

It is true as the respondent, on brief argues, that mere belief on the part of a taxpayer that a return is not required is insufficient to constitute reasonable cause. However, in the instant case reasonable men might well differ as to whether there was tax due. We can divine no reason why our determination that there was no negligence sufficient to support imposition of additions to tax under section 6653(a) due to the complexity of the issues involved herein should not supply sufficient "reasonable cause" to relieve the petitioners under section 6651(a) as well.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*