HERBERT K. STEVENS AND MRS. HERBERT K. (L. L.) STEVENS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2967–64. Filed June 30, 1966.

*William H. Beck*, for the petitioners.
*Richard M. Schwartz*, for the respondent.

HOYT, *Judge:* Respondent determined the following deficiencies in petitioners' joint Federal income tax returns:

| Taxable year | Deficiency |
| --- | --- |
| 1960 | $1,075.32 |
| 1961 | 1,072.54 |
| 1962 | 485.28 |
| Total | 2,633.14 |

Petitioners have previously agreed to all but one of the several adjustments set forth in the notice of deficiency. The only issues remaining for our decision are:

(1) Whether expenditures made by petitioner, Herbert K. Stevens, for the training and boarding of four horses are deductible as ordinary and necessary business expenses or whether they must be capitalized as the cost of purchasing one-half interests in each of the four horses, and

(2) If any portion of the total expenditures deducted in petitioners' returns should have been capitalized, what is the proper *amount* to be so capitalized?

### FINDINGS OF FACT

The stipulation of facts is incorporated herein by this reference. Petitioners reside at Versailles, Ky., and for the taxable years 1960, 1961, and 1962 they filed their joint Federal income tax returns with the district director of internal revenue, Louisville, Ky.

Herbert K. Stevens (hereinafter referred to as petitioner), is the owner and operator of a thoroughbred stable and farm near Lexington, Ky. During the years 1960, 1961, and 1962 petitioner boarded and trained for third parties approximately 40 horses per day on a year-round basis. In addition to these horses in training, petitioner owned two or three horses under his own name during this period.

During 1958 petitioner boarded and trained horses for Marion H. Woody of Cincinnati, Ohio. In the summer of 1958 petitioner and Woody attended a horse sale at which petitioner assisted Woody in selecting a horse named Sweet Note which Woody purchased. After the purchase was consummated, Woody approached petitioner with a proposition. He proposed that he and petitioner should join together in the acquisition of a horse. Petitioner would select the horse to be purchased, Woody would pay the entire purchase price, and petitioner would bear the entire cost of maintaining and training the horse. The horse would be entered in races and the two parties would split all winnings. An oral agreement was reached with the provision that petitioner would have the right to determine if, when, and where the horse would be raced. The following day petitioner and Woody, pursuant to their oral agreement, purchased at auction a horse named Fleet John.

Subsequent to their joint venture involving Fleet John, petitioner and Woody joined together under identical arrangements in the purchase of three other horses. On or about July 27, 1959, they purchased a filly named Fleet Rebelle. On or about July 26, 1960, they acquired another filly named Venture, and on September 19, 1960, they acquired a colt named Fair Bandit. Woody paid the entire purchase price for all four of these horses and they were all purchased in his name. A

separate written contract was entered into by petitioner and Woody with respect to each of the four horses, in which contracts Woody conveyed a one-half interest in each horse to petitioner.

The written agreements with respect to Fleet John and Fair Bandit were in all material respects identical and they provided in part as follows:

\*      \*      \*      \*      \*      \*      \*

The party of the first part [Woody] agrees to sell one-half interest to the party of the second part [petitioner]. In consideration, in lieu of cash, for said one-half interest in the above-described horse, the party of the second part agrees to feed, break, train, keep shod and pay all veterinary and vanning bills and any or all costs necessary to properly prepare the above-named horse for racing and while he is racing.

It is agreed by both parties to this agreement that any and all earnings due to racing or service of the above described horse shall be shared equally between both parties to this agreement.

It is also agreed that any money received through the sale of said horse or any money received from insurance arising from the death of said horse or any money received from the claiming of said horse shall be equally divided between the two parties to this agreement.

It is further agreed that the cost of any entry fees shall be equally borne by the two parties to this agreement.

The written agreements with respect to Fleet Rebelle and Venture were identical in all material respects and they provided in part as follows:

\*      \*      \*      \*      \*      \*      \*

The party of the first part [Woody] agrees to sell one-half interest in this filly to the party of the second part [petitioner]. In consideration and in lieu of cash for the said one-half interest in the above described filly, the party of the second part agrees to feed, break, train, keep shod and pay all veterinary and vanning bills and any and all costs necessary to properly prepare the above described filly for racing and while she is racing.

In the event it is decided by the two parties to this agreement to breed this filly, then and in that event the party of the second part agrees to board her free of expense to the party of the first part. It is further agreed by the two parties to this agreement that any stud fees in the breeding of this filly shall be equally borne by the two parties to this agreement and any produce of such filly shall be the joint property of the two parties to this agreement.

It is agreed by both parties to this agreement that any and all earnings due to racing shall be shared equally by both parties to this agreement.

It is further agreed that any money received through the sale of said filly or any money received from insurance arising from the death of such filly or any money received from the claiming of this filly shall be equally divided between the two parties to this agreement.

It is further agreed that the cost of any entry fees shall be equally borne by the two parties to this agreement.

In accordance with the terms of the above agreements, petitioner paid all the expenses for feeding, breaking, training and shoeing the horses and all veterinary and vanning bills and all costs necessary to properly prepare the horses for racing and while they were racing.

Petitioner did not bill Woody for any of these expenses, nor did Woody pay any of these expenses.

During the years here in question petitioner received his share of the winnings from the racing of the horses which he owned jointly with Woody, and he reported such amounts on his returns for those years. In 1961 petitioner's share of the winnings was approximately $3,400 and in 1962 his share was approximately $7,300.

On November 17, 1960, the horse, Fleet John, was "claimed" (sold) for $5,000, and petitioner received one-half of the sales proceeds, or $2,500.[1]    Fair Bandit was sold in 1963 for $500, and petitioner received one-half of the sales proceeds, less sales commission, or $225.    Venture was sold in 1963 for $42,000, and petitioner received one-half of the sales proceeds, less sales commission, or $19,950.    Fleet Rebelle was sold in 1963 for $10,500 and petitioner received one-half of the sales proceeds, less sales commission, or $4,987.50.

During the tax years in question petitioner charged his horse-owner customers at a rate of $10 per horse per day for horses which he trained.    In addition to training horses, which was done only at race tracks, petitioner provided a boarding service for horses at his farm. He charged approximately $100 per month for boarding on his farm. Petitioner's costs for providing these services to third parties were approximately $8 per day per horse in training and approximately $1 per day for boarding at the farm.    The substantial difference between daily costs in training and daily costs on the farm results from the substantially greater feeding and labor costs involved in maintaining the horses at a race track during training.

Petitioner's expenses for boarding and training his own horses were somewhat less because he could add a few to the number he was boarding or training for others without the addition of extra help. In petitioner's own words: "Then the only expense I have on that horse is what he eats, and the blacksmith, and the other extra expenses that average[d] over a month's time don't amount to much a day."    His expenses for his own horses at the farm were also $1 daily but at the track between $2 and $3.

In 1960 Fair Bandit was in training at the track 103 days; Fleet John was in training 322 days, until he was sold; Venture was in training 158 days and Fleet Rebelle was on the track 274 days and on the farm 92 days.

In 1961 Fair Bandit was at the track 304 days and on the farm 61 days; Venture was in training at the track all 365 days of the year and Fleet Rebelle was in training 220 days and on the farm 145 days.

---

[1] No issue is raised or argument made as to the gain realized by petitioner on this transaction and both at trial and on brief the parties are agreed that the only issues presented are those set forth hereinabove.

In 1962 Fair Bandit was at the track 296 days and on the farm 69 days; Venture was at the track 365 days (181 days while petitioner had her there and 184 days while petitioner's brother had her there), and Fleet Rebelle was on the track 78 days and on the farm 287 days.

During the tax years in question petitioner maintained records of all his expenses of operating his stable and farm. However, these records were not kept in such a manner as would permit a precise breakdown and allocation of costs attributable to any of the four horses which he owned jointly with Woody. In determining the deficiency in this case respondent estimated that petitioner's costs attributable to these four horses were $5 per day per horse on the average throughout the 3 years involved, considering the relative amounts of time spent by each horse at the race track and at the farm.

After auditing petitioner's income tax returns, respondent determined that the portion of petitioner's total farm and stable expenses attributable to the maintenance of the four horses which petitioner owned jointly with Woody should be disallowed as a deduction and should be capitalized as the cost to petitioner of acquiring his one-half interest in those horses. Respondent calculated the amount to be capitalized by estimating the cost of maintaining each horse at $5 per day. Respondent then determined an annual allowable deduction for depreciation of each horse based upon the total of the capitalized daily costs attributable to each horse as of the end of each year.

ULTIMATE FINDING OF FACT

The daily cost to petitioner of maintaining the horses, Fleet John, Fleet Rebelle, Venture, and Fair Bandit, pursuant to his agreements with Woody, was $5 per day per horse when those horses were owned by petitioner and Woody in 1960, 1961, and 1962.

OPINION

In addition to his business of training and boarding horses for third parties, petitioner also trained and raced horses which he owned himself (or owned jointly with Marion H. Woody). There is no dispute that during the years here in question petitioner was in the trade or business of racing horses for profit.

During 1959 and 1960 petitioner acquired one-half interests (jointly with Marion H. Woody) in each of four horses. Petitioner paid all of the expenses of maintaining and training these horses while they were jointly owned, and he deducted in his tax returns these expenses for the years 1960, 1961, and 1962 (as an unsegmented portion of his *total* farm and training expenses). Respondent disallowed the deductions on the theory that the entire amount expended by

petitioner on the four jointly owned horses must be capitalized as the cost to petitioner of acquiring his one-half interests in the horses.

We agree with respondent to the extent that at least some portion of these expenses, which would otherwise be deductible as ordinary and necessary business expenses, must be capitalized as petitioner's acquisition costs in the particular factual circumstances here present. It is obvious that petitioner had some acquisition cost for his interests; these interests were not acquired for nothing. Although Woody paid the entire purchase price for each horse, he did not give petitioner a one-half interest in each without consideration. Petitioner himself testified that all of his transactions with Woody were at arm's length, and that no gift was ever given or intended with respect to the four horses here involved.

On the other hand, we cannot agree that 100 percent of the expenses for these four horses must be capitalized throughout the period of petitioner's joint ownership. It seems ludicrous that if any of these horses were owned for 20 years, for example, every penny of petitioner's maintenance costs would have to be capitalized throughout the 20 years, and petitioner's cost basis would grow and grow to astronomical proportions. Yet one of respondent's revenue agents testified that this would be the proper treatment (with appropriate annual depreciation deductions). The plain fact of the matter is that petitioner was racing these four horses as part of his business; he was earning taxable income from his share of their winnings. Just as it cannot be said that petitioner acquired his one-half interests in the horses for nothing, it cannot be said that he incurred no ordinary and necessary expenses attributable to his horse-racing business and deductible from the income produced by his business activity as part owner of the four horses in question.

We think that if the parties had applied some simple horse sense to their controversy they would have come up with what appears to us to be the obvious solution. If petitioner had acquired his one-half interests for cash at the outset, paying one-half of the purchase price to the persons from whom the horses were purchased, then, presumably, petitioner and Woody would have shared the maintenance expense burden on a 50–50 basis instead of petitioner's paying 100 percent of these expenses. Instead of arranging their joint venture in this manner, they agreed that Woody would pay 100 percent of the purchase price and petitioner would pay 100 percent of the expenses. In effect, Woody assumed petitioner's half of the purchase price and as consideration for this, petitioner assumed Woody's half of the expense burden. Thus, in substance, the consideration given by petitioner for his half interests was his payment for Woody of *Woody's one-half* share of the total expenses—*not* the payment of *all* of the expenses.

It is obvious that 50 percent of petitioner's expenditures for the horses went for petitioner's benefit since petitioner owned a half interest in the horses and received one-half of all the income they produced. The half of the expenses which *benefitted petitioner* cannot be deemed consideration paid to Woody (or anyone else) as part of the acquisition cost of the horses. Looking at the transaction from Woody's point of view, since he only owned half interests in the horses and was entitled to only half the winnings and sales proceeds during the period when petitioner was paying all the expenses, obviously only half of petitioner's total expenses for the horses was being paid for his (Woody's) benefit.

We hold that one-half of the total expenditures incurred by petitioner pursuant to his agreements with Woody with respect to the four horses, Fleet John, Fleet Rebelle, Venture, and Fair Bandit, must be capitalized as petitioner's cost of his half interests in these horses.

This leaves the question of what *amount* is to be capitalized. Petitioner's itemized deductions were not broken down on a horse-by-horse basis, nor did his books and records permit such a breakdown. The expenses attributable to the four horses here involved were an unsegmented portion of the total expenses relating to all horses trained and/or boarded during the taxable years.[2] Respondent determined the deficiency with respect to this item using an estimate of $5 per horse per day as the total expense which was to be capitalized. We consider this a reasonably accurate approximation.

Petitioner testified that it cost him $1 per day on the farm and $8 per day in training (at the race track) to maintain and train horses for third parties, but that it cost him less to maintain his own horses than the horses of third-party customers since he could add his own horses to his operation without additional labor costs. He also testified how many days each of the four horses spent at the track during 1960, 1961, and 1962 and how many days at the farm. Using this data and a cost of $8 per day at the track and $1 per day at the farm, respondent calculated on brief a weighted-average annual cost per horse for the four horses as follows:

|  | Per day |
|---|---|
| 1960 | $5.08 |
| 1961 | 6.68 |
| 1962 | 5.73 |

Considering petitioner's testimony as to the time spent by the four horses on the farm and at the track and considering the testimony of

---

[2] The itemized deductions were categorized on the tax returns according to type of expense, e.g., blacksmith, stable drugs and medicine, farm repairs and supplies, feed, gas and oil, horse purses to owners, wages, jockey club, jockey fees, seed and fertilizer, stable repairs and supplies, stall rent, horse board and training, vanning and shipping, and veterinary.

petitioner and his brother, who was also a public horse trainer, regarding the average costs of maintaining horses at tracks and on farms, and using our best judgment on the record as a whole, we conclude and have found as an ultimate fact that petitioner's total costs attributable to the four horses here involved was $5 per day per horse. Cf. *Cohan v. Commissioner*, 39 F. 2d 540 (C.A. 2, 1930).

Hence, we hold that petitioner must capitalize as acquisition costs the amount of $2.50 per day per horse during the time (within the tax years here in question) in which he owned one-half interests in the horses, Fleet John, Fleet Rebelle, Venture, and Fair Bandit. An appropriate allowance for depreciation of these capitalized accounts may be determined in the Rule 50 computation.[3]

*Decision will be entered under Rule 50.*

---

[3] Respondent in the deficiency notice apparently made allowance for depreciation on the amounts which he had capitalized at $5 per day per horse. The deficiency is shown in the notice as a net figure—after adjustment for allowable depreciation, and the details of the depreciation allowance are not set forth. We assume that respondent would allow depreciation at the same rate even though we have held that the amount to be capitalized is $2.50 per horse per day—rather than $5 as determined by respondent. Although it would seem that capitalization of expenses would also necessitate an adjustment in the amount of gain or loss realized by petitioner upon the sale of his one-half interest in Fleet John in 1960, there is no indication that respondent made such an adjustment in calculating the net deficiency, and an examination of petitioner's 1960 return fails to reveal that any gain or loss was reported with respect to sale of Fleet John. See fn. 1, *supra*.