M. LESLIE GRANT and ALICE M. GRANT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Grant v. Commissioner
Docket No. 8495-76.
United States Tax Court
T.C. Memo 1980-242; 1980 Tax Ct. Memo LEXIS 341; 40 T.C.M. (CCH) 609; T.C.M. (RIA) 80242; July 9, 1980, Filed *341 Held: Expenditures by a partnership in which one of the petitioners was a limited partner were part of the consideration paid by the partnership for stock and were not deductible as business expenses under sec. 162 or as exploration expenses under sec. 617, Internal Revenue Code of 1954. Held further: Petitioners are liable for the additions to tax under secs. 6651(a) and 6653(a) of said Code. Lester *342 A. West, for the petitioners. James D. Vandever, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION
NIMS, Judge: For the taxable year 1971, respondent determined a deficiency in petitioners' income tax in the amount of $43,193.83 and also asserted additions to tax under sections 6651(a) and 6653(a)[1] in the respective amounts of $9,111.21 and $2,172.24. Concessions having been made, the issues for determination are: (1) Whether LAM, a partnership in which petitioner M. Leslie Grant was a limited partner, incurred deductible losses as a result of payments made in connection with mining claims owned by Collinsville-Twin Creek, Inc.; (2) Whether petitioners' failure to file a timely return for 1971 was due to reasonable cause; and (3) Whether any part of the underpayment of tax for the taxable year 1971 was due to petitioners' negligence or intentional disregard of the rules and regulations. FINDINGS OF FACT
Some of the facts have been stipulated. The stipulation of facts *343 and the attached exhibits are incorporated herein by this reference. At the time of filing their petition, petitioners resided in Santa Barbara, California. In 1971 petitioner M. Leslie Grant (hereinafter referred to as petitioner) was a limited partner in the partnership known as the LAM Company ("LAM"). Pursuant to a contractual arrangement with Collinsville-Twin Creek, Inc. ("CTC"), LAM expended in 1971 approximately $104,000 in connection with mining claims owned by CTC. These expenditures gave rise to a $103,875.22 net loss for LAM, all of which petitioners claimed on their individual income tax return for 1971.
Certain mining claims were originally purchased in 1970 by LORI Explorations LTD (N.P.L.), a corporation of British Columbia ("LORI"), from Mrs. A. T. Van Dolah ("Mrs. Van Dolah"). On August 25, 1970, Mrs. Van Dolah and LORI entered into a contract whereby LORI agreed to purchase from Mrs. Van Dolah a group of unpatented placer mining claims in Alaska. These placer mining claims were commonly known as the Twin Creek and Collinsville mines and were situated in the Fairview Mining District in the Palmer-Talkeetna Recording District.LORI obtained these mining claims, *344 which also included the mining camps, miscellaneous equipment and other personal property located at the Collinsville Mine, for a purchase price of $400,000. This amount was payable by means of a $50,000 cash down payment, with the $350,000 balance being payable out of 10 percent of the net smelter proceeds. LORI further agreed to make $100,000 in exploration and development expenditures by May 1, 1971. In a subsequent agreement dated January 11, 1971, the date by which LORI was required to perform such exploration and development was extended to September 1, 1971. In the original purchase agreement of August 25, 1970, with Mrs. Van Dolah, LORI agreed "to immediately take steps to form a corporate vehicle for the Alaska operations, and to expedite the formation of the corporation and completion of the contract arrangements herein at the earliest possible time." To that end, CTC was incorporated under the laws of Alaska on September 1, 1970; all of its 100,000 authorized shares were issued to LORI. CTC's stated business activity was the mining of gold and the development of unpatented mineral claims located in the Fairview Mining District in the Talkeetna Recording District, *345 Alaska. On April 19, 1971, Al Pfau and Max Gumpel, as representatives of the American Investors Group ("AIG"), entered into a contract with LORI whereby AIG agreed to purchase 51 percent of CTC's outstanding stock (51,000 shares). That agreement provided in pertinent part: We [AIG] hereby offer to purchase from you 51% of the issued and outstanding shares in the capital stock of your wholly owned subsidiary, Collinsville-Twin Creek Inc., an Alaska corporation, upon the following terms and conditions: 1. You [LORI] covenant that: a) Collinsville-Twin Creek Inc. (herein called "CTC") is a corporation duly incorporated under the laws of the State of Alaska, U.S.A., and is presently in good standing. b) Lori is the registered and beneficial owner of all 100,000 issued shares in the capital stock of CTC (herein called "the said shares"). c) There are no liens, charges or encumbrances on the said shares, and Lori has the right to dispose of same and enter into this letter of intent. d) CTC is the holder of an interest in a total of 225 unpatented placer mineral claims located in the Fairview Mining District, in the Talkeetna Recording District, State of Alaska, U. *346 S.A., particulars of which are correctly stated in Lori's Prospectus dated November 3rd, 1970, which you have delivered to us and we have read. e) On the Closing Date hereinafter referred to, CTC will be free and clear of any financial obligation or liability save and except its obligations to Mrs. A. T. Van Dolah of Anchorage, Alaska. 2. We will purchase from Lori, fifty-one per cent (51%) of the issued shares of CTC for the sum of $75,000 U.S. Funds which shall be paid as follows: a) The sum of $10,000 upon inspection and approval of the said claims by us, and in any event no later than 12:00 noon on April 23rd, 1971, force majeur [sic] to apply. b) The balance of $65,000 on or before the 10th day of May, 1971, (herein called "the Closing Date"). 3. We covenant to: a) Expend upon the said claims prior to November 1st, 1971, a minimum of $135,000 U.S. funds by way of exploration and development work to be carried out for the purpose of putting the said claims into production. Administration costs shall not exceed 10% of amounts expended. b) Meet CTC's [sic] [2] obligations under its agreement with Mrs. A. T. Van Dolah, dated August 25th, 1970, as amended by *347 Agreement dated March 17th, 1971. c) Keep the said claims in good standing by filing all work done by us as assessment work. 4. If required, we will expend an additional $40,000 U.S. funds on the said claims, which, if expended, will bring our total expenditure to $175,000. It is anticipated that this expenditure will bring the Collinsville-Twin Creek Group of claims into commercial production and that the operation thereon will be self-sustaining. However, in the event that further expenditures are required to put the said claims into production, Lori and us will contribute the additional funds required in accordance with our respective interest in CTC. The capital demands for the year 1971 will not greatly exceed $175,000.
5. On the Closing Date, or upon payment to Lori of the sum of $75,000, whichever first occurs, Lori shall endorse for transfer the share certificates representing the said shares and shall deposit the same with a mutually satisfactory escrow agent. The escrow agent shall be instructed to deliver said share certificate to you upon payment in full of the purchase price, and completion *348 by you of the minimum expenditures to be made on the said claims hereunder, and shall be instructed to return said share certificate to Lori in the event of the default by you of any term of this Agreement.
6. Lori grants to us an option to purchase an additional 24% of the total issued shares of CTC for the sum of $125,000 on or before November 1st, 1971. This option is not exercisable in part. * * *
14. It is contemplated that we may prefer to have our interest in the said claims or in CTC in the form of a limited partnership, and Lori in good faith acknowledges that it will amend this agreement wherever possible to carry out our mutual intentions hereunder. 15. It is further contemplated that the terms of this agreement will be set forth in a formal written agreement to be executed by all parties involved. LAM was formed in May, 1971. It was a successor in interest to the contractual rights and obligations given to AIG in the contract between AIG and LORI. Max Gumpel and Al Pfau were specified as the general partners of LAM; petitioner M. Leslie Grant was named as the sole limited partner. A portion of the LAM partnership agreement provided as follows: 4. *349 CHARACTER OF BUSINESS: The express, limited and only purpose for which this partnership is to exist, is to engage in the business of acquiring, owning, renting, maintaining and operating gold mine claims in the State of Alaska. A meeting of CTC's board of directors was held on May 10, 1971. At that meeting, three of CTC's directors resigned and were replaced by the partners of LAM.In addition, petitioner was elected president, Max Gumpel was elected vice president and Al Pfau was elected secretary-treasurer. The newly constituted board of directors approved and ratified the transfer of the 51,000 shares of CTC's stock owned by LORI to LAM; the issuance of new stock certificates manifesting that transfer was authorized. A stock certificate for 51,000 shares of CTC stock, in the name of Al Pfau, Max B. Gumpel and M. Leslie Grant, d/b/a LAM, a Limited Partnership, was forwarded to Al Pfau with an accompanying letter dated June 21, 1971, from an Alaskan attorney named James K. Talliman. This stock certificate was transferred to LAM even though the obligation to expend $135,000 for exploration and development had not been completed by that time. In connection with fulfilling *350 LAM's obligation to make the additional exploration expenditures, the LAM partners visited the CTC mining camp. Since the camp had been abandoned and unused for many years prior to 1971, most of the mining equipment was antiquated and in a state of disrepair. During 1971, LAM made expenditures of approximately $104,000. Most of this money was used to make the camp site habitable and to effect a major overhaul of the abandoned mining equipment. Some of the concrete results of these expenditures were: the extension of an airfield located on the mining site; winterizing the camp; and the purchase of new equipment to be used in the mining operations. On July 26, 1972, LORI and LAM entered into a written agreement in which LAM was expressly recognized to be the successor in interest to AIG for purposes of the agreement dated April 19, 1971. The agreement further provided in pertinent part, as follows: 4. LORI and LAM have heretofore verbally entered into certain agreements for the modification and clarification of said Agreement of April 19, 1971 and desire to set forth said agreements herein. Said agreements are as follows: a. Said Agreement of April 19, 1971 recites that *351 CTC is the holder of an interest in a total of 225 unpatented placer mineral claims referred to above herein. It is understood and agreed that CTC is the holder and owner of such interest in said claims, that neither LORI nor LAM have or own a direct interest therein and that their connection with said claims exists solely and entirely as that of shareholders of CTC. * * *
c. It is understood and agreed that LAM has performed its agreements with LORI with respect to the purchase of the said 51,000 shares of CTC, that LAM is now the shareholder of record thereof and has paid the full consideration therefor. d. It is understood and agreed that: (1) LAM has complied with the provisions of Paragraph 3(a) of said Agreement of April 19, 1971 by the expenditure of $135,000 in funds for exploration and development. (2) LORI and LAM have heretofore revoked and cancelled that portion of the provisions of Paragraph 4 of said Agreement of April 19, 1971 requiring that LAM expend an additional $40,000.00 in funds for exploration and development. Said revocation and cancellation is hereby confirmed. (3) CTC is the sole and exclusive owner of the machinery and equipment acquired *352 by LAM in the expenditure of a portion of the funds required under Paragraph 3(a) of said Agreement of April 19, 1971, said machinery and equipment being shown on the statement prepared by Thomas, Rompa and Head dated April 5, 1972 showing an acquisition cost of $19,456.00. (4) The funds expended by LAM pursuant to Paragraph 3(a) of the Agreement of April 19, 1971 are the operating expenses of LAM excepting, however, the expenditures made for the acquisition of machinery and equipment above referred to. Neither CTC nor LORI is obligated to reimburse LAM for the amount expended by it pursuant to Paragraph 3(a) of the Agreement of April 19, 1971. (5) All contributions by way of the payment of cash or otherwise by either LORI or LAM to CTC have been, are, and will be considered as advances from shareholders or loans reimbursable by CTC to the party making them. This provision, however, shall not apply to the initial $135,000.00 expended by LAM for exploration and development as hereinabove provided. * * *
(8) Neither LORI no LAM shall be required to make any direct expenditure of funds in the further exploration, development and/or operation of said claims except by way *353 of capital contributions to CTC as specifically provided for in this Agreement. * * *
(10) Paragraph 14 of said Agreement of April 19, 1971 is hereby revoked in its entirety. It is understood and agreed that LAM may hold and continue to hold its shares in CTC as a limited partnership or in any other form of legal entity which it may choose. 5. Except as herein expressly modified, amended or clarified, said Agreement of April 19, 1971 shall remain in full force and effect; provided, however, that if there are any conflicts between said Agreement and this Agreement, the provisions of this Agreement shall be controlling. During 1971 and thereafter, LAM and LORI abided by CTC's corporate form. At various times from 1971 to 1974, board and shareholder meetings were held and minutes thereof were taken; directors were elected; federal income tax returns for CTC were also filed. Petitioner filed a federal individual income tax return for 1971 on August 2, 1973. The LAM partnership return for 1971 was filed as an attachment to petitioner's 1971 return. On the LAM partnership return, no income was reported while expenses in the amount of $103,875.22 were claimed. This *354 $103,875.22 loss was claimed in its entirety by petitioners on their return for 1971. Petitioner did not file a timely 1971 return because he believed that he did not have any taxable income. He thought that the LAM loss offset any taxable income he would have had otherwise. Petitioner was aware, however, of gross receipts for 1971 of approximately $364,000: $164,000 in receipts from the partnership Grant and Sons and approximately $200,000 in gross receipts received from the sale of stock. As a result of the LAM loss claimed and various itemized deductions, petitioners reported that they had no income tax liability for 1971. The only tax liability reported on their return was $585, attributable to self-employment taxes. OPINION
In this case, petitioners have sought to deduct $103,875.22 in expenditures that LAM, the partnership in which petitioner M. Leslie Grant was a limited partner, made in 1971 in connection with the exploration of various mining claims in Alaska. During 1971 and all relevant times thereafter, CTC, an Alaskan corporation, was the exclusive owner of these unpatented mining claims. CTC was formed by LORI, a Canadian corporation, to explore and *355 develop the mining claims LORI had acquired in 1970 from Mrs. Van Dolah.
LAM was the successor in interest to AIG, the American Investors Group. In a contract dated April 19, 1971, LORI agreed to sell AIG 51 percent of its CTC stock. By the terms of that agreement, AIG agreed to pay LORI $75,000 and spend $135,000 for the exploration and development of the mining claims by November 1, 1971. The parties subsequently agreed that LAM had complied with these provisions of the contract; as a consequence, LAM became a 51 percent shareholder of CTC. Petitioners argue that the $104,000 amount paid in connection with fulfilling LAM's obligation (as AIG's successor in interest) under the terms of the April 19th contract is deductible in full by the LAM partnership either as ordinary and necessary business expenses or as exploration expenses under sec. 617. As a result, petitioners conclude that they are entitled to deduct the husband's proportionate share of these LAM expenditures. [3]
*356 Respondent has presented two main arguments to defeat petitioners' claim for a deduction. Respondent contends that the LAM payments were made pursuant to the April 19, 1971, contract with LORI as part of the consideration for the acquisition of the 51,000 shares of CTC stock held by LORI. According to respondent's view, the LAM expenditures constitute non-deductible capital outlays. Respondent also maintains that the expenditures cannot be deducted since allowance would run afoul of the well established principle that a shareholder is not entitled to deduct expenses which are properly attributable to the corporation. Petitioners have devoted a significant portion of their argument to the question of whether the particular expenditures made by LAM constituted repairs vis-a-vis capital improvements. See e.g., Midland Empire Packing Co. v. Commissioner,14 T.C. 635 (1950). We feel, however, that this emphasis misses the mark. If the payment of otherwise deductible expenses is part of a capital asset's acquisition cost, then current deductions are precluded. Sec. 263; *357 Stevens v. Commissioner,46 T.C. 492 (1966), affd. 388 F.2d 298 (6th Cir. 1968). It is a maxim of the tax law that the tax consequences of a particular transaction generally must turn on substance rather than form. E.g., Knetsch v. United States,364 U.S. 361 (1960). Here, however, we need not look behind the form by which the parties freely chose to effect the acquisition of LAM's interest in the subject venture, for in this instance form and substance coalesce. LAM acquired the stock of CTC; it did not acquire the assets of CTC or enter into a joint venture or partnership with CTC. We are in agreement with respondent that the $103,875.22 in exploration costs represents part of the bargained for consideration which LAM was required to spend in order to acquire the CTC stock. As a consequence, such expenditure becomes a non-deductible capital outlay. Pursuant to the contract with LORI in April, 1971, LAM agreed to pay LORI $75,000; expend $135,000 for exploration and development by November 1, 1971; and "[meet] CTC's [sic] [4] obligations under its agreement with Mrs. A. T. Van Dolah dated August 25th 1970, as amended *358 by Agreement dated March 17th, 1971." By the terms of the Van Dolah-LORI agreement (including the subsequent amendment), LORI had agreed to expend $100,000 for exploration and development of the mining claims by September 1, 1971. It is thus apparent that LAM's expenditures in connection with the exploration of the mining claims inured to LORI's benefit -- LORI, by virtue of its agreement with Mrs. Van Dolah, was obligated to expend a comparable amount ($100,000) for exploration and development of the mining claims. LAM's exploration payments thus relieved LORI of its obligation to Mrs. Van Dolah and, accordingly, must be characterized as additional consideration flowing to LORI as seller of the CTC shares. Moreover, paragraph 5 of the LORI-AIG (LAM) contract, in addition to providing that the 51,000 CTC shares were to be deposited in escrow after AIG paid LORI $75,000, stated: * * * The escrow agent shall be instructed to deliver said share certificate to you upon payment in full of the purchase price, and completion by you of the minimum expenditures to be made *359 on the said claims hereunder, and shall be instructed to return said share certificate to Lori in the event of the default by you of any term of this Agreement. [Emphasis added.] [5]
In Stevens v. Commissioner,46 T.C. 492 (1966), aff'd. 388 F.2d 298 (6th Cir. 1968), the taxpayer entered into four separate joint ventures with one Marion H. Woody. Each of the ventures entailed the acquisition of a race horse and the sharing of any race winnings or proceeds from any sale of such horse. Woody paid the entire purchase price for each horse, while the taxpayer paid the entire costs of maintaining and training the horses. This Court held that one-half of what were otherwise deductible maintenance expenses were capital expenditures since they represented the taxpayer's cost of acquiring a one-half interest in the horses (at page 497): We agree with respondent *360 to the extent that at least some portion of these expenses, which would otherwise be deductible as ordinary and necessary business expenses, must be capitalized as petitioner's acquisition costs in the particular factual circumstances here present. It is obvious that petitioner had some acquisition cost for his interests; these interests were not acquired for nothing. Although Woody paid the entire purchase price for each horse, he did not give petitioner a one-half interest in each without consideration. * * *
In effect, Woody assumed petitioner's half of the purchase price and as consideration for this, petitioner assumed Woody's half of the expense burden. Accord, Commissioner v. Rowan Drilling Co.,130 F.2d 62 (5th Cir. 1942); Ashworth v. United States, an unreported case ( S.D. Ill. 1971, 28 AFTR 2d 71-5976, 71-2 USTC par. 9710); but cf. Fulcher v. United States, an unreported case ( M.D. Fla. 1972, 30 AFTR 2d 72-5344, 72-2 USTC par. 9633) (rent paid for drilling equipment was deductible as an intangible drilling expense; the acquisition of stock in a drilling company was incident to a separate transaction). *361 Petitioners rely heavily upon paragraph 14 of the April 19th contract [6] and have also directed our attention to that portion of the LAM partnership agreement which states that LAM was formed for the purpose of "maintaining and operating gold mine claims in the State of Alaska." According to petitioners, these two provisions and paragraph 10 of the July 26, 1972, agreement between LAM and LORI [7] provide evidence that LAM's activities during 1971 went beyond the mere passive holding of CTC shares. In essence, petitioner is asking this Court to disregard the form of the transaction which AIG *362 (LAM) and LORI freely chose, namely, the acquisition of 51,000 CTC shares or, in effect, to pierce the corporate veil of CTC. Although it is true that LAM's activities went beyond the passive holding of CTC stock, those activities were undertaken for the purpose of acquiring the 51,000 CTC shares and represent additional consideration paid to LORI. Here, LAM did not pay the expenses in connection with any of its own business activities, its own business assets (aside from the CTC stock) or in connection with a joint venture between it and CTC; CTC was the exclusive owner of the mining claims at all relevant times. LAM never took the appropriate steps to acquire a direct interest in the mining claims. [8]
*363 The rights guaranteed under paragraph 14 of the AIG/LORI agreement do not alter the fact that LAM's interest in the mining claims was held through its ownership of the CTC stock. Paragraph 14 merely indicates that LORI would use good faith to amend the agreement so that AIGcould take out its interest in the claims or in CTC in the form of a limited partnership. This is what in fact subsequently transpired when LAM succeeded to AIG's interest in the contract and became a 51 percent shareholder of CTC (and not LORI's joint venturer). At no time did LAM have any direct interest in the mining claims. In sum, we would be hard pressed to view LAM's $103,875.22 payment as anything other than consideration paid to acquire the CTC stock. Accordingly, since the payments by LAM represented the cost of acquiring the CTC stock, petitioners are not entitled to deduct any portion thereof. [9]
Respondent asserts that petitioners are liable for a 25 percent addition to tax under section *364 6651(a)[10] for failing to file a required return. Although the return in the instant case was filed 16 months late, petitioners disclaim liability for this penalty: petitioner testified that he did not think it was necessary to file a return as he believed that he did not have any taxable income.
Section 6651(a) subjects taxpayers to an addition to tax for failure to file a required return, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect * * *." In the case at bar, petitioner merely claimed that *365 he believed that he did not have any taxable income for the year in question. He did not state whether he sought the advice of counsel in reaching this conclusion. In the absence of advice from competent counsel, a taxpayer's erroneous belief that he did not have taxable income does not constitute reasonable cause under the statute. Heman v. Commissioner,283 F.2d 227 (8th Cir. 1960), aff'g. 32 T.C. 479 (1959); Manning v. Commissioner,614 F.2d 815 (1st Cir. 1980), aff'g. a Memorandum Opinion [11] of this Court. *366 Accordingly, we hold that petitioners are liable for an addition to tax under sec. 6651(a) for failure to file a required return. Respondent has also asserted that petitioners are liable for an addition to tax under sec. 6653(a) for negligence or intentional disregard of rules and regulations. Generally, a taxpayer has the burden of proving that the Commissioner's determination regarding a sec. 6653(a) penalty is erroneous. Cleveland Chiropractic College v. Commissioner,312 F.2d 203 (8th Cir. 1963), aff'g. a Memorandum Opinion of this Court; Dorfman v. Commissioner,48 T.C. 478 (1967). Petitioners have conceded that respondent's increase of $1,164.30 in petitioners' income (attributable to an unreported capital gain received by petitioner's partnership, S. B. Highlands) was correct. There has been no evidence presented to prove that the underpayment attributable to this unreported income was not due to negligence or intentional disregard of rules and regulations. Accordingly, we sustain respondent's determination that petitioners are liable for *367 the addition to tax under sec. 6653(a). Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue, except as otherwise expressly indicated.↩
2. LORI, not CTC, was the party to the Van Dolah agreement.↩
3. Petitioner's assertion that he was entitled to claim the first $100,000 of any LAM partnership loss is not an issue in this case. Furthermore, although petitioners actually claimed a deductible loss of $103,875.22 through LAM, the claimed deductibility of $3,875.22 over and above the $100,000 is not explained. However, since we hold for respondent in this case the question of the proper allocation of partnership losses becomes moot.↩
4. The obligations were actually those of LORI, since it, not CTC, was the party to the Van Dolah agreement.↩
5. Although the certificate for the CTC shares was transferred to LAM before the expenditures had been completed the existence of the default provision nevertheless supports the interpretation that the exploration expenditures were additional consideration paid for acquiring the CTC shares.↩
6. Paragraph 14 provided: It is contemplated that we may prefer to have our interest in the said claims or in CTC in the form of a limited partnership, and Lori in good faith acknowledges that it will amend this agreement wherever possible to carry out our mutual intentions hereunder. ↩
7. Paragraph 10 of that agreement provided: (10) Paragraph 14 of said Agreement of April 19, 1971 is hereby revoked in its entirety. It is understood and agreed that LAM may hold and continue to hold its shares in CTC as a limited partnership or in any other form of legal entity which it may choose.↩
8. It is also interesting to note, by reference to a letter from William Pompa to LAM, that someone on behalf of LAM inquired into the possibility of a Subchapter S election for a liquidation of CTC. That letter stated: The only way that you will avoid the double taxation problem, the way I see it, would be to form a joint venture upon completion of your separate agreement with LORI at which time Collinsville-Twin Creek, Inc. should be dissolved. It is my understanding that you will run into trouble with LORI on this last proposal. It is thus apparent that one or more of the LAM partners were cognizant that LAM's interest in the claims via the ownership of the CTC subjected any gains passed on to the shareholders to double taxation. This cognizance clearly undercuts any attempt to undercut the viability of CTC as a separate entity for tax purposes.↩
9. Since we have found that the LAM payments represented the acquisition cost of the stock we need not consider respondent's other arguments to preclude deduction of the payments at issue.↩
10. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return * * * unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;↩
11. Petitioner's reliance on Dillin v. Commissioner,56 T.C. 228↩ (1971), is misplaced. That case involved a cash basis taxpayer who renounced his United States citizenship and moved to the Bahamas prior to the time he received any payment for the services he had rendered. The Court was satisfied that the taxpayer did have reasonable cause in believing that his earnings were exempt from United States taxation because of his relinquishment of both his citizenship and residence. There is no similar claim here concerning a belief of total exemption from United States tax.