T.C. Memo. 1997-134


UNITED STATES TAX COURT


ALBERT J. MILLER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22733-92.                    Filed March 17, 1997.


<u>Lawrence V. Brookes</u>, for petitioner.

<u>Ewan D. Purkiss</u> and <u>Andrew P. Crousore</u>, for respondent.


MEMORANDUM OPINION

KÖRNER, <u>Judge</u>:  This case is before the Court on

petitioner's motion for summary judgment as supplemented under

Rule 121.[1]  Respondent determined that petitioner, acting as

general partner of certain limited partnerships, was personally

_____

[1]  All statutory references are to the Internal Revenue Code
in effect for the years in issue, and all Rule references are to
the Tax Court Rules of Practice and Procedure, except as
otherwise noted.

liable under section 1461 for his failure to withhold tax due under section 881, as required by section 1442, on payments made by such limited partnerships to A-Alphatronics Hong Kong Limited (A-Alpha), a Hong Kong corporation, for research and development services, to the extent that such payments were U.S. source income.

Respondent does not contend that any of the partnerships are shams, nor that any adjustments are required under section 482. The notice of deficiency provides that petitioner's failure to withhold gave rise to the following deficiencies:

| Year | Deficiency |
|------|-----------|
| 1976 | $189,300 |
| 1977 | 374,463 |
| 1978 | 639,555 |
| 1979 | 320,664 |
| 1980 | 321,300 |

On a motion for summary judgment, the moving party must show the absence of dispute as to any material fact and that a decision may be rendered as a matter of law. Rule 121(b); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994). The facts will be viewed in the light most favorable to the nonmoving party. Elias v. Commissioner, 100 T.C. 510, 514 (1993); Naftel v. Commissioner, 85 T.C. 527, 529 (1985). The party opposing the motion must set forth specific facts showing there is a genuine issue for trial, and cannot rest upon mere allegations or denials. Rule 121(d); O'Neal v.

<u>Commissioner</u>, 102 T.C. 666, 674 (1994). A genuine factual issue will be material only if its determination one way or the other would affect the outcome. <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 248 (1986). Ultimately, if there exists any reasonable doubt as to the facts at issue, the motion must be denied. <u>O'Neal v. Commissioner</u>, <u>supra</u> at 674; <u>Sundstrand Corp. v. Commissioner</u>, <u>supra</u> at 520. We set forth a summary of facts relevant to our discussion that do not appear to be in dispute; the facts are stated solely for purposes of deciding the motion and are not findings of fact for this case. Fed. R. Civ. P. 52(a); <u>Sundstrand Corp. v. Commissioner</u>, <u>supra</u> at 520.

<u>Background Information</u>

Beginning in 1972, petitioner researched and developed inventions. The inventions were placed into limited partnerships. The partnerships then paid A-Alpha to perform research and development. The Hong Kong corporation then subcontracted all of its research and development contracts, in varying proportions, to wholly owned U.S. and Hong Kong corporations and to independent subcontractors. Respondent asserts that pursuant to section 881(a), of the amounts paid by the limited partnerships, a flat 30 percent is due on that portion of the funds which reentered the United States under a subcontract.[2] Further, respondent determined that petitioner, as

_____

[2] There is no tax treaty between the United States and Hong
(continued...)

general partner of each limited partnership, was personally liable for the withholding tax due because he was a withholding agent under section 1442. Sec. 1461.

Each limited partnership was formed under the laws of a State of the United States and operated using a calendar year. Once an idea was selected and assigned to a limited partnership, petitioner, acting as the general partner of each limited partnership,[3] negotiated a research and development contract with A-Alpha, a Hong Kong limited liability company formed under the laws of Hong Kong. Capital was raised from investors by selling limited partnerships interests, which represented 50 percent of the limited partnerships. The interests sold varied in amount but were typically between $10,000 and $20,000. Additionally, each investor agreed to become personally liable for 125 percent of the investor's cash investment. Once the capital was raised, the limited partnerships obtained loans from Wells Fargo Bank. The total amount of capital raised ranged from $400,000 to $800,000. This amount was then paid (less attorney's fees and other expenses) to A-Alpha.

---

[2](...continued)
Kong.

[3] Petitioner contends that he was not the general partner of certain of the limited partnerships formed in 1980. This is a factual dispute, and we resolve it in favor of respondent, the nonmoving party. Elias v. Commissioner, 100 T.C. 510, 514 (1993).

Shortly after the formation of the limited partnerships, those partnerships each granted an option to Engineering Systems Corp. (ESC) for the purchase of all rights to the invention involved, exercisable upon its becoming market-ready. In consideration of the option, ESC secured the loans of the limited partnerships with time deposits made with Wells Fargo, and agreed to pay the partnerships quarterly payments until the option was exercised. The quarterly payments for the option were equal to the interest that became due on the loans. The minimum exercise price of the option was equal to the principal amount of the loan. Pursuant to a collateral agreement, the partnerships agreed to pay interest and principal as it became due on the loan,[4] not to make any disbursements until the loan was liquidated or the pledged assets were returned, and to cause the pledged assets to be released as the partnerships received royalties.

During the years in issue, petitioner was the chairman[5] of the board of directors of A-Alpha, but at no time owned any stock of A-Alpha. The shareholders of A-Alpha were outside investors whose interests were held by nominees, and whose identities were

---

[4] The offering memorandum indicated that the option agreement provided sufficient income to cover loan interest.

[5] Chairmanship of a Hong Kong limited liability company is the equivalent of being an executive officer of a U.S. corporation.

allegedly unknown to petitioner.  A-Alpha was a holding company which owned both U.S. and Hong Kong corporations.[6]

In the United States, A-Alpha had direct and indirect subsidiaries capable of performing research and development work, ESC and Ferrite Manufacturing Co. (Ferrite).  ESC, Ferrite, or

---

[6] Alphatronics Mfg. Ltd. (Alpha Mfg.), a Hong Kong corporation, was a wholly owned subsidiary of A-Alphatronics (A-Alpha).  Petitioner was a director of Alpha Mfg. from Apr. 4, 1976.  Alphanetics Co. Ltd. (Alphanet), a Hong Kong limited liability company, was a wholly owned subsidiary of A-Alpha.  Petitioner was a director of Alphanet from Jan. 25, 1975.  On Mar. 31, 1981, Alphanet was sold to Atlas Indus. Ltd. (Atlas).  Alphanet had three subsidiaries, Alphanetics Mfg. Co. Ltd. (Alphanet Co.), a Hong Kong limited liability corporation, Alphanetics Mfg. (Alphanet Mfg.), a California corporation, and Ferrite Mfg. Corp. (Ferrite), a California corporation.  Petitioner was a director of Alphanet Co., and a secretary of Ferrite.  Data Magnetics Ltd. (Data), a Hong Kong limited liability company, was a wholly owned subsidiary of A-Alpha; on Nov. 28, 1978, Hong Kong Shanghai Bank sold assets of Data to A-Alpha.  Ferromagnetics Corp. (Ferro), a Nevada corporation, was a wholly owned subsidiary of Data acquired on Apr. 23, 1979.  Data Magnetics Corp. (Data Corp.), a California corporation, was a wholly owned subsidiary of Data.  Petitioner was Data Corp.'s secretary.  Administronics, Inc. (Admin), a California corporation, was wholly owned by A-Alpha; it was never active.  Intermart International, Inc. (Intermart), a California corporation, was wholly owned by Data.  On June 28, 1979, it changed its name to A-Alphatronics International, Inc. (A-Alpha Intl.).  Petitioner was a director for all relevant periods.  National Elec. Corp., a California corporation, was a wholly owned subsidiary of A-Alpha, which was merged into Intermart on Dec. 31, 1977.  Atlas Indus. (Atlas) was a publicly traded Hong Kong limited liability company.  After reorganization, A-Alpha owned 49.85 percent of Atlas.  Petitioner was chairman of the board of Atlas after 1980.  Atlas Electronics International, Inc. (Atlas Intl.), a California corporation, was a wholly owned subsidiary of Atlas; it was formed on Apr., 19, 1980, and was inactive during the years in issue.  Atlas Elec. Corp. (Atlas Elec.) was a wholly owned subsidiary of Atlas and was inactive in the years in issue (no statements or allegations were made as to where Atlas Elec. was incorporated).

their independent third-party subcontractors performed services with respect to some of the inventions. Engineering Systems Corp. (ESC) was formed under the laws of California on April 4, 1974. Although ESC was initially owned by petitioner, during the years in issue it was a wholly owned subsidiary of A-Alpha. ESC received all of its revenue during the years in issue from A-Alpha or A-Alpha's subsidiaries. ESC billed A-Alpha at cost plus 5 percent. Petitioner was the chairman of ESC's board of directors.

The limited partnerships reported income on the cash basis of accounting using a calendar year. A-Alpha and all of its subsidiaries used a fiscal year ending March 31. A-Alpha and its Hong Kong subsidiaries used the Hong Kong completed contract method of accounting, which recognized income and expenses in the year in which the contractor concluded it had completed the contract.[7] ESC filed Federal income tax returns during the years in issue and reported its income using an accrual method of accounting. ESC's financial statements indicate that it incurred net losses of $1,586,451, $2,105,687, and $13,816 during the years 1978 through 1980, respectively, and $1,074,613 for the period beginning April 30, 1974, and ending March 31, 1977.

A-Alpha subcontracted all of the research and development to its Hong Kong and U.S. subsidiaries and to independent

---

[7] Such determination was without regard to whether other parties to the contract considered the contract fully performed.

contractors in contracts that were more than 1 year in duration. The decision as to what portion of the overall contract would be performed in the United States was always made after the end of the first year of the limited partnership.  A-Alpha treated the cash paid in the year of the contract as a deposit with it, to be paid later for services to be performed by others.  Petitioner expected that both A-Alpha and ESC would make a profit from their respective activities.  In fact, they did not.

Discussion

Respondent has asserted that the limited partnerships' payments to A-Alpha for research and development are subject to the 30-percent withholding tax under section 881(a), and that petitioner, as general partner of the limited partnerships, is a withholding agent for purposes of section 1442, and personally liable under section 1461.  Because we conclude that the payments by the limited partnerships are not subject to the 30-percent withholding tax of section 881(a), we do not address whether petitioner was a withholding agent.

There are two taxing regimes that can apply to a foreign taxpayer.  First, where a foreign corporation[8] is engaged in a U.S. trade or business, its effectively connected income from that trade or business (ECI) is subject to taxation on a net

---

[8]  Although we refer to foreign corporations, we note that there are similar provisions which apply to nonresident alien individuals.  See secs. 871-879, 1441.

basis at the same rates as other U.S. taxpayers. Sec. 882(a)[9]. Second, amounts received by a foreign corporation that are fixed or determinable, annual or periodic (FDAP), from sources within the United States (U.S. source), and not effectively connected with the conduct of a U.S. trade or business (non-ECI) are subject to a flat 30-percent tax. Sec. 881(a). FDAP includes interest, dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, and emoluments. Sec. 881(a)(1).

If a U.S. trade or business is a subsidiary of a foreign corporation (FC), distributions by the subsidiary to the foreign corporation, such as dividends or interest, generally are subject to the 30-percent withholding tax imposed by section 881(a)(1). Also, the Commissioner has broad powers to distribute, apportion, or allocate gross income, deductions, credits, or allowances between organizations controlled or owned by the same interests if it is determined that such action is necessary to prevent the evasion of tax or to clearly reflect income. Sec. 482; Hospital Corp. of America v. Commissioner, 81 T.C. 520, 592 (1983). Thus if a U.S. corporation transfers earnings and profits offshore through improperly valued intercompany transactions, section 482 provides a means whereby the Commissioner may recharacterize the

---

[9] Sec. 882(a) provides:

(1) In General.--A foreign corporation engaged in trade or business within the United States during the taxable year shall be taxable as provided in section 11 or 1201(a) on its taxable income which is effectively connected with the conduct of a trade or business within the United States.

- 10 -

transfers to properly reflect income and prevent the avoidance of the withholding tax. See <u>Central De Gas De Chihuahua, S.A. v. Commissioner</u>, 102 T.C. 515 (1994).

If the U.S. trade or business is in the form of a branch of a foreign corporation, earnings and profits of the U.S. trade or business that are not reinvested in that trade or business are subject to the 30-percent branch profits tax. Sec. 884; see also Kuntz & Peroni, U.S. International Taxation, par. C1.05[4][a] (1995). Although the mechanism of taxing the withdrawn earnings and profits under section 884 is different from the withholding tax of section 881(a), the result is the same; namely, that transfer of profits to a foreign person is subject to 30-percent withholding. Section 884 was intended to provide parity between foreign taxpayers doing business in the United States through branches and domestic subsidiaries. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1241(a), 100 Stat. 2576; Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1986, at 1036, 1037 (J. Comm. Print 1987).

Generally, if services are performed in the United States, they give rise to U.S. source income, section 861(a)(3), and services performed outside the United States give rise to foreign source income, section 862(a)(3). Income from services is sourced where the services are performed, without regard to the location of the payor, the residence of the taxpayer, the place of contracting, or the place of payment. Sec. 861(a)(3); <u>Dillin</u>

v. Commissioner, 56 T.C. 228, 244 (1971); sec. 1.861-4(a), Income Tax Regs.

U.S. Source Income

Petitioner insists that the amounts paid by the partnerships are not U.S. source FDAP to A-Alpha. We agree. When the payment for services was made by the limited partnerships, it was made to A-Alpha, a Hong Kong limited liability corporation. At the time of payment, no part of it was U.S. source income of A-Alpha, for no part of the contract had been performed in the United States. Until A-Alpha performed some of the services in the United States, there could not be any U.S. sourced income attributable to A-Alpha.

Respondent argues that the issue revolves around the research and development activities performed in the United States by ESC. Accordingly, respondent contends that the U.S. sourcing requirement of section 881(a) is satisfied. We disagree. While it is true that amounts received in exchange for services are sourced at the place of performance of those services, such performance gives rise to income to the performer of those services. The performer of the services in this case was ESC. The fact that a lower tier corporation performs some services in the United States is insufficient to support a conclusion that its higher tier parent corporation also performs services in the United States. The two corporations are and

should be treated as separate persons unless one corporate form is a sham.

Furthermore, if one who performs services in the United States later remits some of its gross income to a higher tier corporation, such amounts lose their character as ECI, or business income from the performance of the services, and generally would be considered the investment income of the higher tier parent corporation.[10] Although it is true that ESC was a wholly owned subsidiary of A-Alpha engaged in a U.S. trade or business, it was doing business under its own name as a separate and distinct entity. The services performed by ESC did not give rise to U.S. source business income of A-Alpha. In order for A-Alpha to be considered as having U.S. source income by virtue of the performance of services, A-Alpha itself would have to perform the services through agents or employees of its own.[11]

Because respondent did not determine that any section 482 adjustments were necessary, respondent also did not determine that ESC was an instrumentality of A-Alpha, or otherwise controlled by A-Alpha in a way that would require us to disregard the corporate form of ESC. In the absence of evidence or an

---

[10] Such investment income may be fixed or determinable, annual or periodic, depending on the form of payment.

[11] If A-Alpha did perform services, it is possible that it could be considered as carrying on a trade or business in the United States, and accordingly would not be taxed under sec. 881(a), but rather would fall under sec. 882(a), and be taxed on its effectively connected income.

argument by respondent to the contrary, we treat all transactions between ESC and A-Alpha as being conducted at arm's length.[12] The relationship between A-Alpha and ESC is essentially no different, for our purposes, than a contract between ESC and an unrelated independent contractor.

ESC was capable of making payments that constituted FDAP taxable under section 881(a), but, in order for liability to attach, there must have been a distribution of FDAP income by ESC to A-Alpha, whether actual or deemed. Respondent has not determined that a reallocation or recharacterization of intercompany transactions between ESC and A-Alpha is necessary pursuant to section 482, and respondent does not allege that ESC made any actual payments to A-Alpha.

We conclude that A-Alpha did not receive any U.S. source income from the U.S. limited partnerships, and therefore the payments made by the various U.S. limited partnerships are not subject to tax under section 881.

Fixed or Determinable Annual or Periodic Gains, Profits, or Income

Furthermore, even if a portion of the payments made by the limited partnerships were U.S. source, it was not FDAP because it was unascertainable during the year of payment what portion of

---

[12] ESC billed A-Alpha for the work it performed at cost plus 5 percent. If this was below fair market value for the type of services performed, an avenue of attack by respondent is sec. 482.

the contract would be performed in the United States.  Respondent
argues that under the regulations, income is fixed when it is to
be paid in amounts definitely predetermined, and determinable
whenever there is a basis of calculation by which the amount may
be ascertained.  Secs. 1.1441-2(a)(1) and (2), Income Tax Regs;
see also sec. 1.881-2(b), Income Tax Regs.  The decision here to
allocate the contract for research and development was
consistently made by A-Alpha during a tax year of the limited
partnerships that was later than the year of payment by the
limited partnerships.

Respondent argues that in instances like the present case
where it is not yet determinable what portion of a payment is
subject to withholding, the regulations provide that the
withholding agent should withhold on the entire amount, and the
payee can then apply for a refund.[13]  Specifically, section
1.1441-3(d), Income Tax Regs., provides that where the
withholding agent does not know the amount of recognized gain, he
is required to deduct and withhold an amount sufficient to ensure
that not less than 30 percent of the recognized gain is taxed.
This treatment is limited to amounts described in section 1.1441-
2(b)(2), Income Tax Regs, which enumerates certain income items
subject to the 30-percent withholding.  None of the categories of

---

[13]  This argument is at odds with respondent's argument that
withholding was only required in the portion of the contract
performed in the United States.

income enumerated therein apply to the payments at issue.[14] Respondent's argument that withholding was due on the total must fail.

In light of these conclusions, we do not reach whether petitioner was a withholding agent for purposes of section 1442. Because we decide the law as we do, there are no facts which, if proved at trial, would alter our result. Accordingly, petitioner's motion for summary judgment as supplemented will be granted.

<u>An appropriate order and decision will be entered</u>.

---

[14] Those income items are gains described in sec. 402(a)(2) relating to distributions from employee trusts; sec. 403(a)(2) relating to treatment of certain employee annuities; sec. 631(b) or (c) relating to treatment of gain on the disposal of timber, coal, or domestic iron ore with a retained economic interest; gains relating to contingent payments from the sale or exchange of patents, copyrights, and similar intangible property. Sec. 1.1441-2(b)(2), Income Tax Regs.